

AO 91 (Rev. 11/11) Criminal Complaint

# FILED

**NOV 13 2019**

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Shoba Pillay
AUSA Sean K. Driscoll
AUSA Nicholas E. Eichenseer
(312) 353-5300

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

# 19CR     858

UNITED STATES OF AMERICA

v.

JASON BROWN,
　　also known as "Abdul Ja'Me"

CASE NUMBER:

**UNDER SEAL**

**MAGISTRATE JUDGE HARJANI**

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about September 6, 2019, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 2339B and 2 | knowingly attempted to provide material support and resources, namely $500, to a foreign terrorist organization, namely the Islamic State of Iraq and Syria, knowing that the organization was a designated foreign terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism; |

FILED

NOV 13 2019

MAGISTRATE JUDGE
SUNIL R. HARJANI

This criminal complaint is based upon these facts:

　X　Continued on the attached sheet.

NATHAN S. SCHERER, Special Agent
Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: November 13, 2019

City and state: Chicago, Illinois

*Judge's signature*

SUNIL R. HARJANI, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Nathan S. Scherer, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately 2014. As part of my duties as an FBI Special Agent, I investigate criminal violations relating to a variety of federal statutes, and have received training in a variety of areas of criminal investigation, including material support of foreign terrorist organizations. As a result of my training and experience, and information provided by other federal agents with applicable knowledge, I am familiar with the tactics, methods, and techniques used by terrorist networks and their members.

2.      This affidavit is submitted in support of a criminal complaint alleging that on or about September 6, 2019, JASON BROWN, also known as "Abdul Ja'Me," knowingly attempted to provide material support and resources, namely $500, to a foreign terrorist organization, namely the Islamic State of Iraq and Syria, knowing that the organization was a designated foreign terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism, in violation of Title 18, United States Code, Sections 2339B and 2.

3.      This affidavit is based on, among other things: (a) my personal knowledge of the facts and circumstances of this investigation described below; (b) information provided by other law enforcement officers, including oral and written

reports that I have received from other law enforcement officers; (c) information obtained from witnesses, including confidential sources working for the FBI or other law enforcement agencies; (d) telephone records, including subscriber information, toll records, pen registers, trap and trace information, and phone location monitoring information; (e) consensually recorded communications and meetings; (f) the results of physical surveillance conducted by law enforcement officers; (g) a review of search warrant results; and (h) my training and experience and the training and experience of other law enforcement officers involved in this investigation.

4.     Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging BROWN with providing material support and resources to a foreign terrorist organization, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

## I.     BACKGROUND

### A.     Summary

5.     As described in more detail below, BROWN attempted to provide material support and resources, namely money and personnel, to ISIS, a designated foreign terrorist organization. Specifically, on three separate occasions in 2019, BROWN provided $500 to a confidential source with the intent that the $500 be wired to an individual BROWN believed was an ISIS soldier engaged in active combat in

Syria and in need of financial resources, but who was actually an undercover law enforcement officer.

**B.     Background on ISIS**

6.     On or about October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq, then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

7.     On or about May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the Foreign Terrorist Organization listing: The Islamic State of Iraq and al-Sham ("ISIS," which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the Foreign Terrorist Organization listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated Foreign Terrorist Organization. Until his death in October 2019, Abu Bakr al-Baghdadi was the leader of ISIS.

8.     Based on my training and experience, conversations with other experienced agents, and conversations with FBI linguists fluent in Arabic, I have learned the following (1) "Dawla" is an Arabic word that literally means state, but in this context it is a term used by ISIS sympathizers to refer to the Islamic State"; (2) "dawah" refers to the proselytizing of Islam; (3) "hijrah" is an Arabic word meaning "migration," but was commonly used by ISIS to refer to migration to ISIS-controlled territory for the purpose of joining or supporting ISIS to engage in violent jihad; (4) "jihad" is an Arabic word that literally means striving or struggling, but in the context of ISIS supporters, is commonly used to refer to a holy war, fight, or struggle against the enemies of Islam; and (5) "kuffar," in the context of ISIS supporters, commonly refers to any non-believer or non-Muslim, including Americans, Jews, Christians, Hindus, and other non-Muslims.

9.     Based on my training and experience, I know that (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, have traveled to Syria and Iraq to join ISIS, an act they commonly refer to as "hijrah;" (b) since on or about September 22, 2014, ISIS has advocated for the death of Americans and Europeans, including civilians, by any means necessary, including beheading, and its leadership gave blanket approval for this indiscriminate killing by individuals residing in these countries; (c) ISIS spreads its message of violent jihad using social media platforms, such as Twitter, Facebook, YouTube, Instagram, and Paltalk, in order to gain supporters, recruit fighters, and raise funds; (d) using these social media platforms, ISIS posts audio and video – including recruitment messages and updates of events

4

in Syria and Iraq – to draw support; and (e) online chat rooms controlled by ISIS sympathizers effectuate this support.

## C.  Background on the AHK Street Gang

10.     Based on my experience and familiarity with the investigation, including information from confidential sources, undercover law enforcement officers, and other law enforcement officers specializing in gang investigations, the AHK street gang is based in Bellwood, Illinois, and traffics narcotics throughout the Chicago area. AHK is comprised of former members of the Black P-Stone, Gangster Disciples, and Four Corner Hustlers street gangs, many of whom have converted to Islam. The term "AHK" appears to be an alternate spelling of the Arabic word "akh," which means brother. BROWN is the leader of the AHK street gang in the Chicagoland area and requires that all members convert to Islam if they are not already Muslim. According to the Bellwood Police Department, the AHK members traffic various narcotics in order to fund the workings of the street gang.

11.     Based on my experience and familiarity with the investigation, including information from confidential sources, undercover law enforcement officers, and other law enforcement officers, BROWN was radicalized in prison and from viewing lectures of Shaikh Abdullah Faisal,[1] among other ways. Using his position

---

[1] Shaikh Abdullah Faisal (also known as Shaikh Faisal and Trevor William Forrest), was previously convicted in a British court for soliciting murder related to his encouragement of Muslims to fight and kill "kuffars." After his conviction and subsequent release from prison, Faisal continued to encourage violence and terrorist acts in his sermons, including in the pro-ISIS Paltalk chat room he operated, known as "Authentic Tauheed." On or about August 25, 2017, a New York state grand jury indictment was unsealed charging Trevor William Forrest, also known as Shaikh Abdullah Faisal, and Shaikh Faisal, with terrorism-related charges under New York State law. On or about December 5, 2017, the United States Department of

as the leader of the AHK street gang, BROWN actively recruits and radicalizes members and others to support ISIS.

## II. FACTS SUPPORTING PROBABLE CAUSE

### A. BROWN Viewed Faisal's Video Lectures

12. According to Georgia state court records, in or around June 2016, BROWN was arrested by state law enforcement in Clayton County, Georgia. According to the Clayton County Police Department records, following BROWN's arrest, a search warrant was obtained for several phones seized from BROWN, including a phone with phone number (312) 961-1232 ("Subject Phone 22").[2]

13. The FBI obtained a copy of the information contained on Subject Phone 22, which I have reviewed. Among other things, the web history for the phone included over a dozen articles viewed from Faisal's "Authentic Tauheed" website. For example, included in the web history for Subject Phone 22 were links to videos on the "Authentic Tauheed" website with the following titles: "11 RIE: The FIVE PILLARS

---

the Treasury's Office of Foreign Assets Control ("OFAC") named Faisal a Specially Designated Global Terrorist, pursuant to Executive Order 13224, based on Faisal's provision of support to ISIS. *See* https://treasury.gov/press-center/press-releases/Pages/sm0231.aspx.

[2] Law enforcement further confirmed BROWN as the user of Subject Phone 22 as follows, among other ways:

a. According to Verizon records, Subject Phone 22 is subscribed to by Individual HP, who is BROWN's wife. Subject Phone 22 was the phone number assigned to a cell phone seized from BROWN in connection with his 2016 arrest in Georgia (see infra paragraph 24).

b. According to Google subscriber records, a Gmail account ("Subject Account 7a") listed Subject Phone 22 as the associated phone number. BROWN listed Subject Account 7a on a credit card application with Capital One, along with his address on Linden Avenue in Bellwood, Illinois. The same address on Linden Avenue in Bellwood is listed on BROWN's Illinois driver's license. I compared BROWN's driver's license photo with an individual I observed while conducting surveillance of BROWN on multiple occasions and concluded they are the same person.

OF TAUBAH By Shaikh Faisal," which was viewed on Subject Phone 22 on May 19, 2016; and "Note: Manhood in Islam-Shaikh Faisal," which was viewed on Subject Phone 22 on each of May 27 and May 28, 2016.

14.     BROWN was indicted in Clayton County, Georgia on firearms-related charges, to which he pled guilty and was sentenced to a term of imprisonment. BROWN was released on parole on or about June 13, 2018.  BROWN's parole is scheduled to terminate on or about June 13, 2020.

**B.     BROWN Recruited AHK Members and Others to Support ISIS**

15.     As referenced above, BROWN is believed to use his position as the leader of the AHK street gang to actively recruit and radicalize AHK members and others to support ISIS.

16.     For example, on or about January 15, 2019, CS-2 had a conversation via phone with AHK street gang member Individual TC in person, which conversation

was consensually audio and video recorded.[3] When discussing BROWN and other

AHK members, Individual TC told[4] CS-2:

> The only two names that . . . Yaya and, and Big AHK [BROWN] can give to
> them people around them . . . it's two names . . Bro, I'm gonna tell you. Anwar
> Awlaki and Sheikh Faisal al Jamaicaee . . . Like when I came home from the
> joint, they were sending each other videos . . . like shit you ain't supposed to
> look at. You feel me? They talking about, doing, they teaching the shorties
> [young gang members] that they could do shit that I never heard nobody in my
> life say.[5]

---

[3] CS-2 was arrested by local police in late 2017 for narcotics offenses and agreed to cooperate with law enforcement in the hope that CS-2's cooperation will be considered by the state in its decision as to what charges, if any, to file against CS-2. CS-2 later agreed to cooperate with the government in exchange for monetary compensation. Through in or around May 2019, CS-2 was paid approximately $22,000. Before his arrest in 2017, CS-2 sold distribution quantities of heroin to a law enforcement source in two separate transactions. To date, CS-2 has not been charged for those transactions. In or around May 2019, CS-2 was informed of the government's evidence against CS-2 for those two heroin transactions. The government has not made any promises to CS-2 other than to take CS-2's cooperation into account when deciding what, if any, charges to file against CS-2. According to a criminal history inquiry, CS-2 has several prior narcotics-related arrests and no prior felony convictions. To date, information provided by CS-2 has proven to be reliable and has been corroborated through consensual recordings, controlled purchases of narcotics, seizures of narcotics and narcotics paraphernalia, physical and electronic surveillance, and other information gathered in this investigation.

[4] The investigation has included the recovery of posts, photos, chats, and videos from publically accessible portions of social media accounts, and consensual audio and video recordings made by confidential sources and an undercover law enforcement officer (collectively, the "recorded conversations"). Some of the recorded conversations have been summarized in this Affidavit. The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review of the recorded conversations, and not on final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries do not include all statements or topics covered during the course of the recorded conversations. At various points in the affidavit I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from the confidential sources, the contents and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

[5] Based on my training and experience in counterterrorism investigations, I know that Anwar Al-Awlaki (a.k.a. Anwar Al Aulaqi) hereinafter, "Awlaki") was a dual citizen of the United States and the Republic of Yemen (hereinafter, "Yemen"). From in or around 2004 to 2011, Awlaki was a resident of Yemen. Awlaki used the Internet to post sermons and blog entries

17.     BROWN also attempted to recruit and radicalize CS-3,[6] examples of which are as follows:

a.     On or about January 21, 2019, BROWN sent CS-3 a link to Faisal's lecture entitled, "Why We Hate the Shia."

b.     On or about January 25, 2019, BROWN and CS-3 engaged in an in-person conversation, which conversation was consensually audio and video recorded, and during which BROWN discussed topics such as Faisal's imprisonment in Jamaica and individuals who BROWN believed were false Islamic scholars because they lied about the religion, including BROWN stating as follows:

> My view point, you know what I'm saying ummm . .. Islamic State, sharia, jihad. You see what I'm saying. A lot of people say Al Sunnah al Jamat, but they don't talk about the sharia. They don't talk about jihad. They don't talk about hijrah. You see what I'm saying? They don't talk about, you know what I'm saying, the Islamic State.
> . . .
> I'm fixing to make Hijrah over there. I'm not gonna tell nobody [unintelligible]. Because sheikh tell ya though don't tell nobody. We plan on leaving. We plan on doing this.

---

in which he justified conducting violent jihad against the United States, United States citizens, and United States military personnel, and attempted to radicalize and recruit followers to engage in violent jihad. On or about July 16, 2010, the United States Department of Treasury announced that Awlaki had been specially designated as a global terrorist under Executive Order 13224 as a "key leader" of AQAP and for "supporting acts of terrorism and for acting for or on behalf of AQAP." On or about September 30, 2011, Awlaki was killed in Yemen.

[6] CS-3 was a subject of an FBI investigation beginning in or around April 2013. However, after a thorough investigation, the FBI discovered no wrongdoing by CS-3 and the investigation was closed in or around September 2017. Instead, CS-3 began voluntarily working with the FBI in or around July 2017 in exchange for monetary compensation, and has been utilized in this investigation. As of in or around November 2019, CS-3 had been paid approximately $29,000. A criminal history inquiry revealed that CS-3 has no prior arrests or convictions. To date, information provided by CS-3 has proven to be reliable and has been corroborated through consensual recordings, physical and electronic surveillance, and other information gathered in this investigation.

18.     On or about July 12, 2019, CS-3 engaged in an in-person meeting with BROWN, which meeting was consensually audio and video recorded. During this meeting, BROWN told CS-3, "I had sent the Shaikh money. You feel me? You know Sheikh supposed to be getting expedited [*sic*] here?" BROWN further told CS-3, "I think he lost it so he's gonna be coming here soon [Faisal lost his appeal of the order of extradition and will be extradited to the United States from Jamaica soon]."

## C.     BROWN's Plans to Travel to Syria to Join ISIS

19.     As discussed above, on or about January 25, 2019, during an in-person meeting between CS-3 and BROWN, which meeting was consensually audio recorded, BROWN told CS-3 that he was planning to make hijrah. More specifically, BROWN stated, "I'm fixing to make hijrah over there. I'm not gonna tell nobody. Because Shaikh [Faisal] tell ya though, don't tell nobody. We [BROWN and his family] plan on leaving. We plan on doing this." Notably, this statement about "hijrah" occurred after BROWN discussed "Islamic State" in his conversation with CS-3.

20.     On or about March 6, 2019, during another in-person meeting between CS-3 and BROWN, which meeting was consensually audio and video recorded, CS-3 asked BROWN for clarity regarding the process of making hijrah. BROWN informed the source that "you gotta go where ahk [the ISIS brothers] and them at . . . and establish, you know what I'm saying, the state [the Islamic State]. You gotta establish the State . . . then you gotta have an army."

21.     On or about March 8, 2019, during an in-person meeting between CS-3 and BROWN, which meeting was consensually audio and video recorded, BROWN

told CS-3 that he and his family were "ready to go." BROWN further stated that he knew he could not travel straight to Syria and that he believed that he would be imprisoned if he tried. Based on my training and experience, I believe BROWN intended to use routes that would allow him to gain entry to Syria and ultimately reach ISIS.

22.     On or about April 12, 2019, during an in-person meeting between CS-3 and BROWN, which meeting was consensually audio and video recorded, BROWN said "If I go somewhere, Sheikh, out of the country, you know where I'm going, right? Mecca ... I'm going there first. Or I'm going where? Abu Jaffar!! You hear me?!" "Abu Jaffar" is the online persona of CS-3's purported cousin (who unbeknownst to BROWN was an FBI undercover employee (the "UC"), as discussed in greater detail below), whom CS-3 and the UC represented to BROWN was a member of ISIS. Based upon the investigation and his conversations with CS-3 and the UC, I believe BROWN was declaring to CS-3 his intention to connect, in person, with "Abu Jaffar" (the UC), who he believed was an actively fighting member of ISIS in Syria.

**D.     BROWN's Communications with CS-3 and the UC Regarding ISIS**

23.     On or about February 8, 2019, CS-3 engaged in an in-person meeting with BROWN, which meeting was consensually audio recorded. During this meeting, Brown expressed an interest in obtaining women's Islamic clothing for the purpose of commerce. CS-3 advised BROWN that CS-3 had a contact overseas, purportedly a cousin in Syria who sells such clothing.

24.     On or about February 15, 2019, CS-3 engaged in an in-person meeting with BROWN, which meeting was consensually audio and video recorded. During this meeting, BROWN asked CS-3 about CS-3's contact overseas. CS-3 confirmed to BROWN that CS-3's contact was CS-3's cousin (the "UC") and that he was fighting with ISIS. BROWN responded, "Oh brother, I knew it!" and gave CS-3 a fist bump. BROWN then told CS-3 that he had been in contact with Faisal on more than one occasion and that Faisal had warned BROWN to be careful. BROWN explained to CS-3 that Faisal was locked up because he had been talking to an informant. BROWN also referred to beheading as an appropriate consequence for people who talk poorly about the prophet Mohammed, stating, "his head gotta go." Based on my training and experience, I know that beheading is a violent tactic that has been used by ISIS members

25.     During the same conversation on February 15, 2019, BROWN told CS-3 about the necessity of owning a firearm and that one is "not a man" without a firearm. According to the video recording, during the exchange, BROWN pointed his left index finger solely upward and pulled his hand close to his head for the source to see.

26.     On or about February 22, 2019, CS-3 engaged in an in-person meeting with BROWN, which meeting was consensually audio recorded. During this meeting, BROWN again brought up the topic of importing Islamic clothing. CS-3 obtained further details about what types of items Brown specifically wanted to obtain, and CS-3 noted that if BROWN bought them from the OCE he was supporting a good

cause [meaning ISIS]. BROWN responded, "Inshaallah" [an Arabic term for "God willing"], and further acknowledged with a smile while nodding affirmatively.

27.     On or about March 8, 2019, during an in-person meeting between CS-3 and BROWN, which meeting was consensually audio recorded, CS-3 told BROWN that the UC had sent CS-3 a video of ISIS fighters shooting AK-47 style assault rifles in tactical clothing. BROWN responded, "I be looking at all that stuff . . . every day . . . Islamic ahh, it's called ahh jihadiology . . . there's like ten minute videos . . . they used to have videos like every day, like three, four videos."[7]

28.     Later during the same conversation, BROWN showed CS-3 another ISIS video, and told CS-3 that the video was approximately one hour long and showed ISIS "tearing the government officials up" after giving them a chance to repent. Agents reviewed the video referenced by BROWN to CS-3 and observed that it depicted machine gun fire and contained frequent mention of jihad. BROWN provided his own narration of this video to CS-3, describing how the fighters in the video burned their passports to show that they were not going back to their countries of origin. Based on BROWN's narration, agents inferred that BROWN was expressing to CS-3 that jihad overseas consisted of fighting with ISIS.  More specifically, BROWN told CS-3, "it [jihad] cannot be done like it is in Syria. In the US [United States], jihad is done by spreading the word of Islam." Based on the context of the conversation, it appears

---

[7] Based on my training and experience, I know that the website "www.jihadology.net" is a website created by Aaron Zelin, an expert on global jihadism at The Washington Institute. Zelin archived all of the propaganda publicly available that was published by jihadist groups, including al-Qa'ida and ISIS.

that BROWN meant "spreading the word of Islam" to mean radicalizing and recruiting others.

29.     Based upon the investigation and information from confidential sources, it appears that BROWN regularly watched violent ISIS videos, and shared the ISIS videos and philosophy with AHK members, CS-3, and others, in an effort to recruit and radicalize them. As a result, it appears that BROWN viewed his work sharing ISIS videos and philosophy with other gang members and CS-3 as engaging in jihad while inside the United States.

30.     On or about March 12, 2019, CS-3 engaged in an in-person meeting with BROWN, which meeting was audio and video recorded. BROWN initiated a conversation with CS-3 regarding the UC. CS-3 told BROWN that the UC's son had died as a martyr in Syria. BROWN stated that the UC should be happy, which appears to mean that BROWN believed the UC should be proud that his son died as a martyr. BROWN also told CS-3 that he used the "Authentic Tauheed" website, among other websites, to watch videos about ISIS.

31.     On or about April 3, 2019, CS-3 engaged in an in-person meeting with BROWN, which meeting was audio recorded. During this meeting, CS-3 gave BROWN nine women's Islamic robes, which CS-3 represented to BROWN were provided by the UC as requested by BROWN on or about February 22, 2019 (*see supra* paragraph 26). According to CS-3, BROWN appeared excited when he inspected the robes, stating that they were exactly what he was looking for. CS-3 then showed BROWN videos from the UC, in which the UC was purporting to be engaged in

fighting with ISIS. BROWN praised God many times while watching the videos and expressed excitement. BROWN downloaded Messaging Application 1 to one of his phones (not Subject Phone 22) and sent a message and greeting to the UC. BROWN used the username "Farooq Al Amerki."

32.     Approximately three days later, on or about April 6, 2019, the UC and BROWN engaged in a conversation over Messaging Application 1, which conversation was consensually recorded. Referencing the robes that the UC had provided to BROWN as a gesture of good will, BROWN stated:

> In sha Allah . . . all is well shukran [thank you] for the abayas [robes] . . .
> Aamen for the dua and May Allah straighten out your affairs and the brothers
> around u . . . It's such a blessing to hear from the brother who are only
> experiencing life as a Muslim . . . I'm jealous in a good way at your actions . . .
> They surely need to be acknowledged, praised and worship.

33.     Based on the context of this statement, BROWN's comments to the UC appear to indicate that BROWN is jealous of the front-line ISIS fighters and believed them to be the only individuals who were experiencing life as a Muslim.

34.     On or about April 10, 2019, during an in-person meeting between CS-3 and BROWN, which meeting was consensually audio and video recorded, CS-3 showed BROWN another video of the UC purportedly fighting for ISIS in Syria. According to CS-3, BROWN had watery eyes while viewing the video and stated that the UC will be rewarded in heaven, which CS-3 understood to mean that BROWN was praising what BROWN believed was the UC's work fighting for ISIS.

35.     On or about April 11, 2019, the UC exchanged messages with BROWN using Messaging Application 1, which messages were consensually recorded. During

the conversation, they discussed a Faisal lecture and an article written by an individual within the Islamic State who had been critical of Al-Baghdadi. The UC refuted the article and praised Faisal's teaching ability stating that it reminded the UC of Awlaki. BROWN responded, "Yes both are my shaikh," indicating that BROWN viewed both Faisal and Awlaki as his religious mentors.

36. On or about April 30, 2019, the UC exchanged messages with BROWN using Messaging Application 1, which messages were consensually recorded. During the conversation BROWN and the UC discussed a video which had been released by ISIS leader Abu Bakr Al-Baghdadi the day before. BROWN praised the commentary and provided a smiley face emoji as part of his response.

37. On or about July 26, 2019, CS-3 had an in-person meeting with BROWN. During this meeting, BROWN told CS-3 that he supported following Sharia law and not democracy.

**E.    BROWN Attempted to Provide Financial Support to ISIS**

38. On or about May 13, 2019, CS-3 had an in-person meeting with BROWN, which meeting was consensually audio and video recorded. During the meeting, which occurred while BROWN and CS-3 were driving in a vehicle together after eating lunch at a local restaurant, BROWN spontaneously told the source that he "gonna have something [money]" for the UC.

39. On or about May 23, 2019, CS-3 had an in-person meeting with BROWN, which meeting was consensually audio recorded. During this meeting, BROWN again brought up the UC to CS-3 and asked CS-3, "When the last time you

heard from, from the brother? Said . . . said he, said he needs some faloose [an Arabic word for money] didn't he?" CS-3 told BROWN that CS-3 had already provided "something [money]" to the UC. BROWN asked CS-3 "You send something?" and CS-3 responded, "He sent me a contact, and he said erase it." BROWN then told CS-3, "Tell him [the UC] he need another one . . . He need another one I got something [money]. Got something for him [the UC]." Based on BROWN's conversations with CS-3, I believe that during this conversation, BROWN was telling CS-3 that BROWN intended to send money to the UC, whom BROWN believed to be an active ISIS member located overseas in Syria.

40.     On or about August 9, 2019, CS-3 had an in-person meeting with BROWN, which meeting was consensually audio and video recorded. During this meeting, BROWN mentioned to CS-3 that the UC had reached out and asked for money. BROWN wanted to help the UC, but had not been able to find the right moment. He further stated that he could not send money the way the UC requested because he could get in trouble for "aiding and evading."[8] BROWN believed they [law enforcement]" were monitoring his financial activity. BROWN then suggested that he would give CS-3 money to give to the UC. When CS-3 indicated concern that CS-3 may get in trouble for sending money to the UC, BROWN sought to alleviate CS-3's concerns and stated that CS-3 should not be alarmed because CS-3 had family in

---

[8] Based on my training and experience, and BROWN's extensive criminal history, deep suspicion of law enforcement, and use of counter-surveillance during the course of this investigation, I believe that when BROWN said "aiding and evading," he meant that he knew if he provided financial support to the UC, who he believed was a member of ISIS, he would be liable for aiding and abetting ISIS.

Syria so it would not be suspicious. BROWN admitted that he had previously sent money to "brothers behind the wall." BROWN then instructed CS-3 to tell BROWN whatever amount of money CS-3 wanted from BROWN and BROWN would get the money to CS-3.

41.     On or about August 14, 2019, CS-3 had an in-person meeting with BROWN, which meeting was consensually audio and video recorded. During this meeting, the following occurred:

        a.     CS-3 stated, "I'm working on something for him [the UC], if you wanna, you said last time, let me know." BROWN responded, "I got something now, whenever." CS-3 confirmed, "Abu Jaffar [the UC], yeah?" BROWN responded, "Yeah, I got something! I got $2,500 right now. Inshaallah. Whenever, akh. That what my money go to. . ." CS-3 asked, "So you want me to send it with my stuff?" BROWN confirmed, "Yeah." CS-3 asked again, "You sure?" and BROWN said, "I'm positive."

        b.     CS-3 then said, "I don't want to be pushy. I hate to be pushy." BROWN responded, "You ain't even gotta ask me them type of questions. Just be like, 'I'm finna send something,' and then I just, you know. Ain't even gotta. There's a certain way you talk. You see what I'm saying? [BROWN will provide money for the CS-3 to send to the UC and ISIS without CS-3 having to ask with specifics]." CS-3 stated, "Let me know when." BROWN responded, "I got something. I got the 25 [$2,500]."

        c.     CS-3 explained, "They're going through some hard times and stuff." BROWN asked, "But you can't send it like all at once can you?" CS-3 responded,

"No probably [unintelligible] $500, more than that it triggers [law enforcement scrutiny]. I had, I had sent some earlier, but I mean he, they're pushy and I don't blame them. You know what I mean? I don't blame them because, it is what it is [the UC and his fellow ISIS members are pushy in asking for financial support because they are in need of help]."

      d.     BROWN later asked, "So what you want me to give you at, at first? $1,000? How you wanna do it?" CS-3 asked, "You wanna do it hundred, $500 at a time?" BROWN confirmed, "$500? Ok. I'm ready. Whichever way you gonna do it. You gonna send the whole 25 [$2,500] I'll give you the whole 25 [$2,500]." CS-3 rejected that offer of $2,500 stating, "No, no I can't send the whole cause it triggers [law enforcement scrutiny]."

      e.     Later in the conversation, BROWN stated, "then whatever the remainder I'm gonna give to you." CS-3 asked, "You don't have anybody that could do it for you too?" BROWN responded, "To send it? . . . I could have somebody but it's just the whole point. . . I don't wanna put nobody in that type of business [BROWN does not want his people to take the risk]. . . I got plenty of people, akh [brother]. I got all of Bellwood that I could sent to go do it. It just the fact that you know they would be questioned about it."

      f.     BROWN further stated, "Like I told you it's already like, cause I done told them that them people [law enforcement] watching me." CS-3 asked, "Why do you think that?" BROWN responded, ". . . I had caught umm a pistol case. A gun charge. That's probably why you ain't seen me like when you first start coming around

over there, cause I was locked up in Georgia. When I was locked up in Georgia, ya know AHK and them you know we make a transition from Muslim, gang banger to Muslim so now they [law enforcement] tryna say that we, we, we, we are gang bangers still. . . they said I'm the leader of umm AHK city. . ." CS-3 asked, "What's AHK city?" BROWN responded, "That's what they [law enforcement] call Bellwood."

       g.    BROWN later stated, "Like I just say, you ain't even gotta tell me or say nothing about no name or none of that. Just be like, 'I'm finna to send money, you know what I'm saying, to charity.' We just talk like that. We ain't gotta talk like. Just, just be safe, ahk [brother]. You know what I'm saying? But yeah, I got somebody to send. Just like I used to send money to the, to the Shaikh. I had my niece go [unintelligible]. You see what I'm saying? But now . . ."

       h.    Later in the conversation, BROWN instructed CS-3, "Don't let nobody else know what's going on [referring to sending money to the UC for ISIS]. Not even nobody but me and you, akh [brother]. Even though the people that be around me I try and be careful with who I be with, careful with who I bring around, where I be at. . . . I done been locked up. I done been through. I done have murders and everything, akh, you see what I'm saying. So, I ain't just [unintelligible] I wouldn't be here right now if I would've told on myself."[9]

---

[9] According to a criminal history report, BROWN was previously convicted of attempted murder.

42. On or about August 16, 2019, CS-3 had an in-person meeting with BROWN, which meeting was consensually audio and video recorded. During the meeting, the following occurred:

a. CS-3 told BROWN that CS-3 intended to send money to "Abu Jaffar" (the UC) soon. More specifically, CS-3 stated, "I'm gonna go now and send him money." BROWN responded, "You ready?" CS-3 stated, "Yeah. I'm gonna send him some today." BROWN responded, "Oh ok." CS-3 observed BROWN look down and count money under the table. BROWN then stated, "Well you can put this one on me." CS-3 reminded BROWN, "Just give me five hundred. No more. Cause I got five [$500]. Want me to tell him? Or . . .no? Tell Abu Jaffar [the UC] it's from you or no?"

b. BROWN responded, "Allah knows," as he pointed his middle finger up in the air and smiled, before handing CS-3 $500 in $20 bills across the table, which CS-3 understood was intended for CS-3 to send to the UC in support of ISIS. BROWN further stated, "That's the only one that needs to know [meaning Allah] as long as they get it. That's it. . . . He'll find out on, on that day." CS-3 confirmed that BROWN did not want CS-3 to tell the UC that the financial support was from BROWN by asking, "Well I mean I shouldn't tell him, it's from you?" BROWN responded, "No, Sheikh." CS-3 stated, "Up to you, it's your choice. . . . I know he asked you, so . . ." BROWN confirmed, "Oh yeah. You ain't gotta say my name." CS-3 confirmed, "Ok."

43. The following is a still image from the video-recording made of CS-3's meeting with BROWN on or about August 16, 2019, in which BROWN can be

observed holding the $500 in cash and pointing his finger up in the air, while stating that "Allah Knows.":



44.     The next day, on or about August 17, 2019, agents accompanied CS-3 to a local Walmart store to send the money via MoneyGram. CS-3 sent a total of $1,000 via MoneyGram to a government-controlled account, which appeared to go to an account in Iraq, in order to represent $500 from BROWN and $500 from CS-3. The $500 attributed to CS-3 was provided by the government. CS-3 sent the $1,000 via MoneyGram to a government-controlled account in order to ensure CS-3 had proof that CS-3 sent the $500 provided by BROWN to the UC if BROWN inquired and asked for such proof.

**F.     BROWN's Second Attempt to Provide Financial Support to ISIS**

45.     On or about September 6, 2019, CS-3 had an in-person meeting with BROWN, which meeting was consensually audio and video recorded. During the

meeting, CS-3 showed BROWN a picture that purported to be from "Abu Jaffar" (the UC), and stated, "Look how happy this brother [referring to a purported ISIS fighter in the picture]. He got dressed up now. He's got all his gear on him now . . . because of last time [referring to the last time BROWN gave CS-3 money for "Abu Jaffar"]." BROWN responded, "Yeah? Of last time? Oh ok ok ok. For sure." CS-3 stated, "And I think the the brother [purported ISIS fighter] had a feeling, he's like tell him to thank you . . . He sent you a verse." BROWN read the purported verse of Islamic writing sent by "Abu Jaffar," and then stated, "I mean . . . for sure. That's what's up," while giggling.

46.     As the conversation continued, CS-3 told BROWN, "I mean I go every week [sending money to 'Abu Jaffar']. I don't want to push you. Whatever." BROWN responded, "I'm ready. I give you all tens [ten dollar bills]." BROWN began to take out money to give to CS-3, but CS-3 asked for BROWN to wait because he was driving.

47.     Later in the conversation, CS-3 clarified that the person in the photo was "one of the brother that got the stuff. That he's dressed up because of what we sent [money BROWN gave to CS-3 to send to the purported ISIS fighter in August 2019]. That's what he said. You know what I mean?" BROWN responded, "That's great. It don't get no better than that, Ahk [brother]."

48.     After arriving in Bellwood, Illinois, BROWN exited CS-3's car and left money behind in the vehicle. CS-3 asked BROWN "Is this for ahh the brothers [ISIS fighters]?" BROWN responded, "That's for you. Yeah." CS-3 counted the money in front of BROWN, which totaled $500. After driving away, CS-3 met with law

enforcement at a pre-determined location and turned over the money BROWN had given to CS-3. Law enforcement counted the funds, which totaled $500.

49.     That same day, on or about September 6, 2019, an agent accompanied CS-3 to a local CVS store to send the money via MoneyGram. CS-3 sent a total of $1,000 via MoneyGram to a government-controlled account, which appeared to go to an account in Iraq, in order to represent $500 from BROWN and $500 from CS-3. The $500 attributed to CS-3 was provided by the government. CS-3 sent the $1,000 via MoneyGram to a government-controlled account in order to ensure CS-3 had proof that CS-3 sent the $500 provided by BROWN to the UC if BROWN inquired and asked for such proof.

**G.     BROWN's Third Attempt to Provide Financial Support to ISIS**

50.     On or about October 4, 2019, CS-3 had an in-person meeting with BROWN, which meeting was consensually audio and video recorded. During the meeting, CS-3 told BROWN, "Oh I'm doing some donation today to the brothers [purported ISIS fighters]. You told me to tell you so." BROWN responded, "Ok. I got some ahh. I got something [money] on me. It's in the ahh . . . it's in the car. I only got like some tens on me right now but I got it [more money] in the car. I'm finna come to your shop [where CS-3 works] anyway." BROWN then pulled out money and counted it in front of CS-3, but put the money back into his pocket.

51.     Later that day, BROWN met with CS-3 at his place of business, which meeting was consensually audio and video recorded. Prior to departing, BROWN

pulled out cash and began to count it in front of CS-3, as seen in this still image from the video recording:



52.     BROWN then handed the bills to CS-3, who counted it.  CS-3 asked BROWN, "Why did you give me 26?" BROWN responded, "Oh it's 26? It costs to send too [referring to giving CS-3 extra money to cover the cost of sending the money overseas] don't it?" CS-3 then asked BROWN, "This is for ahh . . . the sake of Allah [unintelligible]?" BROWN responded, "Yeah."    CS-3 stated, "You gotta say that because it might, it might, it may seem like, you know, you're paying me for the cars [referring to other business between CS-3 and BROWN]." BROWN, while laughing and shaking his head from side to side, responded, "No, that's not for the cars.  I'll pay you probably like next week for the cars." BROWN then left CS-3's place of business, after which CS-3 met with law enforcement at a pre-determined location and turned over the money BROWN had given to CS-3.  Law enforcement counted the funds, which totaled $500.

53.     That same day, on or about October 4, 2019, agents accompanied CS-3 to a local CVS store to send the money via MoneyGram. CS-3 sent a total of $1,000 via MoneyGram to a government-controlled account, which appeared to go to an account in Iraq, in order to represent $500 from BROWN and $500 from CS-3. The $500 attributed to CS-3 was provided by the government. CS-3 sent the $1,000 via MoneyGram to a government-controlled account in order to ensure CS-3 had proof that CS-3 sent the $500 provided by BROWN to the UC if BROWN inquired and asked for such proof.

III.     CONCLUSION

54.     Based on the foregoing, there is probable cause to believe that on or about September 6, 2019, JASON BROWN, also known as "Abdul Ja'Me," knowingly attempted to provide material support and resources, namely $500, to a foreign terrorist organization, namely the Islamic State of Iraq and Syria, knowing that the organization was a designated foreign terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism, in violation of Title 18, United States Code, Sections 2339B and 2.

FURTHER AFFIANT SAYETH NOT.

NATHAN S. SCHERER, Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on November 13, 2019.

SUNIL R. HARJANI
United States Magistrate Judge

27