**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Nos. 19 CR 858 |
| | ) | Judge Mary M. Rowland |
| JASON BROWN, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR PRE-TRIAL RELEASE**

Defendant, **JASON BROWN**, by and through his attorneys, **THOMAS ANTHONY DURKIN** and **JOSHUA G. HERMAN**, pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3142, *et seq*., and specifically §§3142(i)(3) & (j), *United States v. Salerno*, 481 U.S. 739 (1987), as well as the Due Process, Effective Assistance of Counsel, Counsel of One's Choice, and Excessive Bail clauses of the Fifth, Sixth and Eight Amendments to the Constitution of the United States, respectfully moves for the following relief: (1) that a hearing be held pursuant to 18 U.S.C. §3142(f) so that he may present argument and evidence in support of his pre-trial release; and, (2) that he be released on strict conditions. Pre-trial release, under the extraordinary factors in this unique case, will not only satisfy the Bail Reform Act, but will also permit Mr. Brown to continue with current retained counsel of his choice and to meaningfully participate in his own defense consistent with the Sixth Amendment, two fundamental rights that cannot be met under the current conditions of pre-trial detention.

## I.    __INTRODUCTION__

Seeking release from detention in a terrorism-related case is usually a fool's errand, and undersigned counsel do not do so lightly or naively.  This case, however, compels them to do so if there is to be any real meaning to the presumption of innocence and the two aforementioned rights to counsel of one's choice and to participate in one's own defense.  Put bluntly, under the current conditions of confinement at MCC Chicago, these rights simply are not afforded to Mr. Brown in this complex and convoluted prosecution that has a tremendous amount of discovery material.  The reality is that Mr. Brown has already been detained pre-trial for over thirty (30) months and he still has been unable to review significant portions of the discovery due to not being allowed the proper time and equipment, much less review that material with counsel, who cannot reasonably be expected to meet and review with Mr. Brown under the current conditions at the MCC.  In plain point of fact, unless one wishes to read §3142(i)(3)'s statutory right for the reasonable opportunity to consult privately with counsel, as well as §3142(j)'s right to the presumption of innocence, this case and its extraordinary circumstances require release if Mr. Brown is to have any chance at a trial that comes close to comporting with Due Process and the Effective Assistance of Counsel.

Additionally, it is submitted that Mr. Brown can demonstrate that the factors set forth in 18 U.S.C. § 3142(g) factually support release on strict conditions.  Mr. Brown accordingly requests a detention hearing, which he previously waived without prejudice, to show why the Detention Order should be revoked pursuant to 18 U.S.C. §3145(b).  Indeed, conditions of release exist that adequately address concerns that could be raised by the government or pretrial services, including computer monitoring programs that the government and U.S. Probation Office typically request

and find sufficient for convicted material support defendants serving terms of supervised release. Put simply, if that type of monitoring can be said to be appropriate for convicted defendants who have lost the presumption of innocence, it must certainly be adequate for Mr. Brown, who is still presumed innocent. Mr. Brown would also able to live with his mother in her home as a third-party custodianship, and she is also willing to put property up as bond. His release will allow him to help care for his five children, the burden of which has fallen on his overwhelmed wife. As explained below, this presumes—naively perhaps—that the presumption of innocence meaningfully exists today in the context of terrorism charges.

As noted above, to avoid a dilemma of constitutional dimension—both under the Due Process and Effective Assistance of Counsel of One's Choice provisions—pre-trial release is necessary given the extraordinarily voluminous discovery material that Mr. Brown must review to prepare for trial, much of which Mr. Brown must review in the presence of his counsel at the MCC. Over 100 digital discs of material has been produced to date, including many Blu-Ray discs, a format that Mr. Brown and other MCC occupants have very limited access to review in any meaningful manner. The facilities, in general, are lacking. Mr. Brown is allowed to go to the library one day per week for several hours. If he is fortunate, he is permitted to a couple of extra days per month. However, he has discovered that numerous discs cannot be played due to software compatibility problems or issues with the discs, despite asking the MCC staff for assistance.

Further, during the latest Omicron surge of the COVID-19 virus, other subsequent incidents, and due to overall staffing shortages, inhabitants of the MCC have been repeatedly locked down, unable to control when they can view discovery, call friends and relatives, and even when to shower. The efficacy of these lockdown decisions notwithstanding, they have severely

incapacitated Mr. Brown in his review of the large amount of discovery that he has been provided. Simply put, and through no fault of the hardworking staff on site, the MCC appears to be understaffed and lacks the proper equipment, time, and resources to provide Mr. Brown with the proper, and crucially needed, space to assist in his own defense. Put another way, unless we wish to pretend that the mere charging of a terrorism related offense conclusively and without exception prevents release, then this is the exceptional case that requires Court intervention to fashion a release order that satisfies both the interests of the government, the safety of the community, and, crucially, Mr. Brown's aforementioned rights.

## II.    BACKGROUND

### A. Procedural History

Mr. Brown has now been detained pre-trial at the MCC for over two-and-a-half years following his arrest on November 14, 2019. The arrest was based on a sealed arrest warrant issued on a Criminal Complaint filed under seal the day before, November 13, 2019. (Dkt. #1). The complaint charged Mr. Brown with knowingly attempting to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B and 2. (*Id.*). Interestingly and tellingly, the Complaint charged behavior that took place from approximately June 2018 through September 2019. Mr. Brown made his initial appearance on November 14, 2019, with an attorney appointed under the Criminal Justice Act from the Federal Defender Program. (Dkt. #6). The government made an oral motion for detention, to which Mr. Brown objected. (*Id.*). A detention hearing was then set for November 21, 2019. (*Id.*).

On November 21, 2019, Mr. Brown waived his detention hearing without prejudice. (Dkt. #12). At that point, Magistrate Judge Sunil R. Harjani ordered that "the Defendant shall remain in

custody pending further order." (*Id.*).  Pretrial Services also prepared a Pretrial Bail Report, which made an assessment of non-appearance and risk of danger to the community. (Dkt. #11).  Notably, for reasons that will be addressed further below, Pretrial Services considered the information 'unverified" because Mr. Brown's mother declined to speak to Pretrial Services about her son's case. *Id.*  Prior to the filing of this motion, undersigned counsel advised Pretrial Services that Mr. Brown's mother is not only willing to be interviewed, but is also prepared to serve as Mr. Brown's third-party custodian.   Accordingly, counsel would request that the Court order Pretrial Services to interview Mr. Brown's mother.

On February 26, 2020, an Indictment was returned that charged Mr. Brown with three Counts of knowingly attempting to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B and 2.  (Indictment, Dkt. #29).  Magistrate Judge M. David Weisman entered an order of "no bond set; detained by Magistrate Judge." (Dkt. #32).

As the Court is well aware, on March 16, 2020, Chief Judge Rebecca R. Pallmeyer entered Amended General Order 20-0012 in re Coronavirus Covid-19 Public Emergency, which impacted "all open cases" in the Northern District of Illinois.  This order was also entered in Mr. Brown's case at Dkt. #37. The ongoing impact of the pandemic on Mr. Brown will be discussed in more detail further below.

On April 7, 2020, attorney Glenn Seiden filed his appearance as retained counsel, and appointed counsel was granted leave to withdraw.  (Dkt. ##41, 44, 45).  On November 13, 2020, during a status hearing, Mr. Brown's then-counsel informed the Court that Mr. Brown had told them that he had been receiving legal mail that had been already opened. The Court explicitly "instruct[ed] personnel of the BOP to comply with regulations and open Mr. Brown's LEGAL

MAIL in his presence" and ordered that "The Clerk is directed to send a copy of this order to the legal director for the MCC." (Dkt. #58). This incident is but one example of how Mr. Brown's detention has made it difficult for him to effectively pursue his defense, and how he appears to have been singled out by virtue of the terrorism charges.

On February 24, 2021, a superseding indictment was returned that included three counts of material support in violation of 18 U.S.C. §2339B (Counts One, Two, and Three), as well as the following charges: conspiracy to possess with the intent to distribute 100 or more marijuana plants in violation of 18 U.S.C. §846(a)(1) (Count Four); distribution of 40 or more grams of a substance containing fentanyl in violation of 18 U.S.C. §841(a)(1) (Count Five); distribution of a mixture containing marijuana in violation of 18 U.S.C. §841(a)(1) (Count Six); possession with the intent to distribute 500 grams or more of methamphetamine in violation of 18 U.S.C. §841(a)(1) (Count Seven); possession of firearms as a convicted felon in violation of 18 U.S.C. §922(g)(1) (Count Eight); and, possession of firearms in furtherance of a drug trafficking offense in violation of 18 U.S.C. §924(c)(1)(A) (Count Nine). The Superseding Indictment further contains a forfeiture allegation. Magistrate Judge Wesiman again ordered for the detention order previously issued to stand. (Dkt. #63).

On May 18, 2021, attorney Glenn Seiden moved to withdraw his appearance. (Dkt. #72). The Court granted that motion on May 28, 2021. (Dkt. #74). On July 9, 2021, attorney Douglas E. Whitney filed his appearance as appointed counsel for Mr. Brown. (Dkt. #77). On July 26, 2021, undersigned counsel were retained by Mr. Brown's mother, and on July 30, 2021, they filed a motion to substitute. (Dkt. #79). The Court granted undersigned counsel's substitution of Attorney Whitney on August 2, 2021. (Minute Entry, Dkt. #80). Undersigned counsel filed their

appearances on August 3, 2021. (Dkt. ##81, 82). Since that time, as the Court is aware, the case has proceeded slowly. The government has continued to produce voluminous discovery materials, including classified materials that require security clearances, which both undersigned counsel have. A telephonic status hearing is currently set for June 21, 2022.

### III.  **ARGUMENT**

#### A. **Legal Standards Regarding Detention in Presumption Cases**

A defendant who is ordered detained by a magistrate judge may file with the District Court a motion for revocation or amendment of the detention order. 18 U.S.C. §3145(b). The District Court has discretion to order an evidentiary hearing and consider new evidence when exercising its authority under § 3145(b). *See United States v. Shaker*, 665 F. Supp. 698, 704-705 (N.D. Ind. 1987) (exercising discretion to hold a hearing and consider new evidence on a motion brought under § 3145(b)); *United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991) (district court may hear testimony pursuant to § 3142(f)). The district court conducts a *de novo* review of a magistrate judge's order. Additionally, a detention hearing may be reopened any time based on new information "that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §3142(f).

At the outset of the overview of the statutory provisions and the detention analysis itself, it is important to recall that the Supreme Court has emphasized that "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *Salerno*, 481 U.S. at 755. Indeed, this presumption of release is embodied in the Bail Reform Act, 18 U.S.C. §3142. The

statute states that the Court "shall order" pretrial release, §3142(b), except in certain narrow circumstances. And even if the Court determines under §3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further conditions" that will "reasonably assure" the defendant's appearance in court and the safety of the community. 18 U.S.C. §3142(c)(1) (emphasis added). Thus, under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984), as reprinted in 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.").

As this Court is also aware, under 18 U.S.C. §3142(e), a person may only be detained before trial if it is found that no condition or combination of conditions of an indicted defendant "will reasonably assure the appearance of the [defendant] ... and the safety of any other person and the community." Counsel acknowledge that the material support charge brought under 18 U.S.C. §2339B creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §3142(e)(3).

That presumption is, however, only categorical and based on the charge, not on the individual. It is also rebuttable, not, so far at least, mandatory. Thus, the statute clearly permits release even for individuals charged under the terrorism statutes.[1] Presumption aside, the overriding question remains whether there are conditions or combinations of conditions that will

---

[1] Whether the possibility of release is politically possible in light of the hysteria created by the government's endless War on Terror is another matter.

reasonably assure Mr. Brown's appearance as required and the safety of any other person and the community. 18 U.S.C. §3142(c). Here, it is submitted that release is warranted because there are numerous factors under 18 U.S.C. §3142(g) that rebut the presumption of detention and demonstrate that there are conditions of release that will reasonably assure both Mr. Brown's appearance in court and the safety of the community.

Importantly, a defendant rebuts the statutory presumption by meeting a "burden of production," which involves coming forward "with some evidence that he will not flee or endanger the community if released." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986). In *Dominguez*, the Seventh Circuit emphasized how the "burden of production is not a heavy one to meet." *Id.* More recently, the Seventh Circuit described the burden of production as "light." *United States v. Wilks*, 15 F.4th 842, 847 (7th Cir. 2021). Indeed, the presumption of detention is rebutted by "[a]ny evidence favorable to a defendant that comes within a category listed in §3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(2)." *Dominguez*, 783 F.2d at 707 (*emphasis added*). For instance, any "evidence of economic and social stability" can rebut the presumption. *Id.* As long as a defendant "come[s] forward with some evidence" pursuant to §3142(g), the presumption of flight risk and dangerousness is definitively rebutted. *Id.* ("Once this burden of production is met, the presumption is 'rebutted.'") (quoting *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985)).

Additionally, the burden of persuasion ultimately remains with the government, terrorism charges notwithstanding. *Dominguez*, 782 F.2d at 707; *Jessup*, 757 F.2d at 384. Significantly, "an unrebutted presumption is not, by itself, an adequate reason to order detention."

*Wilks*, 15 F.4th at 847. Thus, even if a defendant does not meet the burden of production, the government still carries the ultimate burden to justify detention. *Id*. Further, the facts that the Court uses to support a finding of detention based on danger to the community "shall be supported by clear and convincing evidence" (18 U.S.C. § 3142(f)(2)(B)) and those to support a risk of flight must be shown by a preponderance of the evidence. *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985).

After the presumption is rebutted, the Court must also consider other evidence about a defendant's history and characteristics. *See Dominguez*, 783 F.2d at 707 ("[T]he rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in §3142(g)."). The Court should not give the presumption undue weight if evidence relating to other 18 U.S.C. §3142(g) factors supports release.

The Seventh Circuit has held that a judge may not detain a defendant in a presumption case based solely on evidence of past dangerousness. Even if the presumption is not rebutted, a judge is prohibited from detaining a defendant "based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct." *Dominguez*, 783 F.2d at 707. This means that, even when a defendant is charged with a serious crime or has a significant criminal history, there may be release conditions that will reasonably assure the safety of the community. *Id.*

Nor can the court order detention in a presumption case based solely on the seriousness of the crime charged. To rebut the presumption of dangerousness, a defendant need not "demonstrate that [the type of crime charged] is not dangerous to the community." *Dominguez*, 783 F.2d at 706.

10

In *Dominguez*, the Seventh Circuit reversed a district court for expecting the defendants to "provide[] evidence that their participation in a narcotics distribution scheme was not a danger to the community." *Id.* As the court explained: "Under the district court's interpretation, few if any defendants in narcotics cases could ever rebut the presumption of dangerousness and thereby defeat pretrial detention." *Id.* Moreover, the Court cannot rely solely on the weight of the evidence to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged. That showing is not really at issue once the presumptions . . . have been properly triggered." *Dominguez*, 783 F.2d at 707.

In short, to rebut the presumption, a defendant simply needs to meet his "light" burden of production by showing is that there is "some evidence that he will not flee or endanger the community if released," and any evidence of the defendant's family ties, community ties, work history, or lack of criminal record can satisfy this requirement. *Dominguez*, 783 F.2d at 707.

Also relevant are the provisions set forth in 18 U.S.C. §§3142(i)(3) & (j), which do not garner sufficient attention in the Bail Reform Act analysis. Section 3142(i)(3) provides that a detention order shall "direct that the person be afforded reasonable opportunity for private consultation with counsel." That of course raises the question about when such "reasonable opportunity for private consultation with counsel" is not possible by the mere conditions of confinement combined with unique aspects about the case, such as the amount of complicated discovery produced in this case. Section 3142(j) instructs that "Nothing in this section shall be construed as modifying or limiting the presumption of innocence," a fact that is all too often lost.

B. **The § 3142(g) Factors Support Release on Conditions.**

1. **In Considering the Nature and Circumstances of the Offense and the Weight of the Evidence, the Government Cannot Show by Clear and Convincing Evidence That Mr. Brown Is a Danger to the Community.**

Unlike many terrorism charges, Mr. Brown is not accused of plotting to commit any acts of violence. Instead, his charges primarily involve three, five-hundred-dollar ($500) payments to an FBI informant (the CHS) who befriended Mr. Brown at his local mosque. Put simply, the CHS used Islam and Mr. Brown's dedication to his religion as a pretense to draw closer to Mr. Brown. It is alleged that this money was to be then given from the CHS to his "cousin," another informant (the OCE), who was pretending to be a fighter within ISIS territory overseas. However, the defense submits that the evidence will ultimately show that it was anything but clear that the funds would be used to support any specific violent acts, and that it was the CHS who was aggressively pushing an agenda independent of Mr. Brown.

Further, the investigation and staggering levels of surveillance on Mr. Brown began well before these undercover operations. The investigation ostensibly began when FBI Chicago opened an investigation into Brown on October 11, 2017, while he was still incarcerated on an unrelated, "straw purchase" of a firearm conviction in Georgia. Discovery indicates that following his arrest for this straw purchase, the contents of Mr. Brown's phone were downloaded and it was discovered that over 1800 emails were sent between Mr. Brown and an account linked to an Islamic lecturer named Shaikh Faisal from March of 2015 to May of 2017. Mr. Brown was also purported to have an unauthorized phone while incarcerated in Georgia for the aforementioned offense, and upon confiscation, the phone was alleged to contain Islamic lectures and related "extremist" content. Curiously, this phone was recycled by the Georgia authorities and the contents were never

12

downloaded. The presence of these emails, videos, and undoubtedly Mr. Brown's faith, would kickstart an unbelievable level of dragnet-style monitoring and surveillance of he and his family, including the FBI installing cameras outside of Mr. Brown's home for stakeouts, flying Cessna spy planes for aerial surveillance, and the imbedding of a seemingly friendly community member who was actually wired with recording devices while they prayed, ate, and talked together.

Arrangements were even made to conduct surveillance on Mr. Brown as he walked out of prison in Georgia, foolishly thinking himself a free man. The CHS was imbedded himself into Mr. Brown's mosque, surveilled his weekly worship, and reported back to the FBI. The infiltration of Mr. Brown's place of worship is just one of the many distasteful tactics used in this investigation. Upon learning that Mr. Brown was trying to kickstart his automobile sales business, the CHS gave Mr. Brown deals on repairs that were too good to pass up, further embedding the CHS in Mr. Brown's life. During one of these repairs, the CHS even mistakenly uncovered an illegal and previously undocumented tracking device that had been placed inside Mr. Brown's car, perhaps used to aid the various spy planes that would follow Mr. Brown and his family. Crucially, the CHS saw how charitable Mr. Brown was to the Islamic faith, and reported back to the FBI how he saw Mr. Brown give two-thousand dollars ($2000) to a mosque in Mali that had sent a speaker to their mosque to fundraise. What followed was the careful and calculated inducement of Defendant to provide material support to a designated FTO, namely ISIS. Suffice it to say, the defense anticipates raising

13

### 2. Mr. Brown Has Strong Family Ties and Does Not Pose a Risk of Failure to Appear.

Mr. Brown's mother lives in Chicago and is prepared to serve as a third-party custodian. Mr. Brown has five children, all young in age and a wife who is struggling to provide daily care as she endures a tremendous amount of stress. While Mr. Brown has maintained connections with his children, the COVID-related restrictions at the MCC have posed incredible obstacles given the extended time-period when no social visits were permitted. Of course, these hardships are not isolated to Mr. Brown. But unlike other defendants at the MCC, his pretrial detention has been extended beyond the norm due to changes in counsel and the ongoing production of voluminous discovery material.

Moreover, unlike other detainees, it appears that Mr. Brown's correspondence with his family is being opened, reviewed, and saved by MCC staff and law enforcement, reviewed by the government, and even produced in discovery. For example, an FD-302 dated February 21, 2021, reveals how an Investigative Support Technician at the MCC forwarded to the AUSA and the FBI "Two outgoing letters to BROWN'S kids/HUE PHONG," the latter being Mr. Brown's wife. (DECLASS_010-000387). The discovery then includes Mr. Brown's letter, addressed to "The Family," in which he expresses his love for his children and wife. There are numerous other personal letters from Mr. Brown to his family that have been produced in discovery for Mr. Brown to see, if for no other reason to inform him that even his letters to his children are being watched. Knowing that he cannot write a letter to his children without it being read by others has posed an unfair and undue burden on Mr. Brown's ability to associate with his loved ones.[2]

---

[2] It also appears that even legal correspondence from Mr. Brown to undersigned counsel has been intercepted by the MCC, saved, and shared with the government for review. The government informed counsel of one instance when

**C. Release on Conditions is Necessary to Ensure That Mr. Brown Receives His Sixth Amendment Right to Effective Assistance of Counsel and Counsel of Choice Given the Nature of the Voluminous Discovery and Conditions Imposed by the Government.**

As the Court is aware, the parties have had ongoing discussions regarding the ongoing production of discovery material in this case. The discovery is massive, comprising of over 124 discs of material that have been produced so far, with the productions continuing to be delivered including yet another large production of twenty-five (25) discs as recently as February 7, 2022. There are multiple hard drives worth of video footage from surveillance cameras that the government has made available for counsel to review in-person. Mr. Brown is not able to review this footage. Two more discs were produced on April 25, 2022 that contained twenty-three (23) lengthy, redacted audio recordings between key characters to the defense as well as Defendant. These recordings and the context held within are impossible to fully decipher without Defendant's meaningful participation, and will thus require extensive attorney time with Mr. Brown at the MCC to review.

Additionally, the government has produced discovery on certain types of media formats, such as Blu-Ray discs, that Mr. Brown has had great difficulty reviewing at the MCC. While Mr. Brown was able to review some of this material, he has more recently brought to undersigned counsel's attention numerous other discs that cannot be played, or that have files that cannot be played on the computers at the MCC. Some of these files are video or audio files that are not

---

this occurred and that additional filters would be put in place to ensure that no legal correspondence would be reviewed by the government. While undersigned counsel appreciate the government's notification of this serious issue, it remains unclear how or why outgoing legal correspondence was opened by the MCC and scanned in the first place, much less whether there were (or have been) other violations of the attorney-client privilege that simply did not make it to the prosecutor's inbox.

compatible with MCC computers. He described an "EF Player" being installed on a disc that was inoperable on the MCC computers.

Mr. Brown has informed counsel that he is permitted library time each Monday, barring lockdowns. Each trip to the library can last up to several hours. He sometimes is allowed to go to the library approximately two additional times per week. Thus, logistically speaking, and even excluding the prevalent and unpredictable lockdowns as well as the impact of MCC staffing shortages, Mr. Brown has shared with counsel that he typically has, at most, 6 library visits per month to review discovery. But, as noted above, even when he is able to go, he often finds that files are inoperable or non-compatible with the MCC's computer. Mr. Brown has tried to seek assistance with MCC staff, but without success. Given the allotted time in the library, Mr. Brown conservatively estimates that it could take him nine months to fully review the reviewable material that has been produced thus far.

To further illustrate the difficulty the discovery production, counsel estimates that to date the government has produced over 37 DVDs and CDs consisting of general discovery and 55 DVDs containing sensitive discovery; similarly 2 Blu Ray discs containing general discovery have been produced while 30 Blu Ray discs contain sensitive discovery. These discs contain, to date, six thousand, six hundred and ninety two (6,692) declassified, sensitive pages of reports that are of the utmost importance to the defense. There have also been difficulties viewing the produced material, in part due to the sheer size of some of the files but also because of the manner in which some of the Blu-Rays were produced. It should be noted that the government has been helpful in mitigating these issues, yet some still prevail as of the date of this filing and counsel are still

learning of Mr. Brown's difficulties as he slowly tries to make his way through the discovery material and newer productions.

To put the difficulty of reviewing the sensitive discovery with Mr. Brown in context, one of the key pieces of discovery is Disc 56, with the corresponding description stating "Sensitive: Disc containing RCFL examination report re: black iPhone (1B-105)".   This RCFL examination of an iPhone was produced on a 50 GB Blu Ray disc, and requires the use of a Cellebrite reader, which was provided on the Blu Ray disc but that Mr. Brown has not been able to operate at the MCC.

Counsel also submit that it is likely that any subsequent extraction report PDF of the phone in question, whenever it is finally able to be accessed, will likely be anywhere from twenty to thirty thousand pages in PDF format (20,000-30,000) for one device. There are eight (8) such devices and corresponding RCFL reports in total, all of which are sensitive. The MCC simply does not provide for the facilities to review that breadth of material. Crucially, the context contained within each text message, file download, and phone call that can be found on these reports, are useless without Defendant's participation and assistance.   Few criminal defendants, Mr. Brown included, could possibly be able to pay for such an unnecessary waste of counsel's time.   Indeed, it is not realistic, or consistent with the Sixth Amendment right to counsel of his choosing, for counsel to spend hours and upon hours at the MCC reviewing other productions of multimedia material with Mr. Brown.

While these concerns may not technically rise under the factors set forth in 18 U.S.C. §3142(g), they are most certainly of paramount concern.   Because it is now apparent that Mr. Brown will not be able to review all the discovery in this case in order to defend himself and assist

counsel—which is absolutely necessary—the only solution consistent with the Sixth Amendment, counsel submit, is release on conditions. While counsel recognize the difficulty of document production in this case given the voluminous digital material involved, the result is, to put it bluntly, an impossible Sixth Amendment predicament that can best only be solved by ordering Mr. Brown's release. This fact, and this fact alone independent of all the aforesaid reasons, should mandate his release on conditions at this point in time.

### D. Release on Conditions is Necessary to Ensure That Mr. Brown Receives His Sixth Amendment Right to Effective Assistance of Counsel and Counsel of Choice Given the Nature of the Extreme Restrictions at the MCC Due to COVID and Continuous Lockdowns

Mr. Brown has been detained pretrial for over thirty (30) months in possibly the harshest conditions that the MCC has ever experienced. As this Court is surely well aware, the COVID-19 pandemic has wreaked havoc on the BOP, including the MCC. It has led to frequent long-term lockdowns and heavy restrictions that are unprecedented, and has created significant obstacles to Mr. Brown's Sixth Amendment right to effective assistance of counsel. As COVID-19 has spread through the BOP, especially during the recent brutal wave of the highly-transmissible Omicron variant, the BOP has also experienced violence and chaos in facilities other than the MCC, resulting in a nation-wide highest-level lockdown for weeks in February 2022, during which there were no visits allowed at all nor were Defendants being brought to Court. During these lockdowns, Mr. Brown has been restricted from visits and has had extremely limited access to phone, emails, and the law library. These lockdowns have also been exacerbated by the widely-reported staffing issues at the MCC. During high-tier lockdown periods, inmates at the MCC are allowed showers only three days a week, and allowed phone calls two days a week.

As of the date of this filing, the MCC is operating under Level 3 Operations of the Infection Prevention Procedures Modifications. According to the BOP's website,[3] this level of operations means that modifications are necessary, the full COVID-19 Pandemic Plan must be followed along with facility-wide use of face coverings, and that daily COVID-19 symptom screening and temperature checking must occur prior to any entry to the facility. Counsel are sympathetic to the morale, conditions and staffing issues amidst the pandemic at the MCC, but must submit that during recent visits in which Level 3 Operational guidelines were supposed to be implemented, none of the above measures were implemented. Counsel did not see staff in face coverings nor screened for their temperature. With all due respect to the tireless staff at the MCC, it is apparent that Defendant stands a far-greater chance of contracting COVID-19 while being held at the MCC and, regardless, the restrictions impose greater impediments to his review of discovery and assistance in preparing his defense.

### E. Conditions of Release Can Be Crafted to Reasonably Assure Mr. Brown's Appearance and the Safety of the Community

As an initial matter, the standard under §3142(g) is whether there are conditions that can "reasonably assure" a defendant's appearance and the safety of the community. The standard is not the impossible standard of absolute prevention of any and all risk.

Mr. Brown's mother would be able to serve as a third-party custodian, and Mr. Brown and his family also have property they could put up for bond. Mr. Brown has five children, whom he misses desperately and can provide care. He is tethered to his community and family, and is consumed with anxiety and fears about their wellbeing while he is detained without bond. Mr.

---

[3] https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp

Brown would be amenable to the strictest conditions of release, including home incarceration. Should there be concerns regarding any online activity or communications with others, the Court should consider the same type of monitoring conditions that the U.S. Probation office often includes in supervised release conditions for material support cases. As noted above, if those conditions are sufficient for those who have been found guilty, they should be more than enough for one who is and must be presumed to be innocent.

## IV.   **CONCLUSION**

For the foregoing reasons, counsel respectfully request a hearing to present argument as to why Mr. Brown should be released on strict conditions that preserve the presumption of innocence and his ability to meaningful consult with counsel and participate in his defense.

Respectfully submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**

**DURKIN & ROBERTS**
209 S. LaSalle St., Suite 950
Chicago, IL 60604
(312) 913-9300
tdurkin@durkinroberts.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60404
(312) 909-0434
Email: jherman@joshhermanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on June 14, 2022, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60404
(312) 909-0434
Email: jherman@joshhermanlaw.com