UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 858 |
| v. | ) | |
| | ) | Judge Mary M. Rowland |
| JASON BROWN | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

# Table of Contents

I.   Procedural History .................................................................................... 1

II.   Factual Background ................................................................................. 3

   A.   Summary ...................................................................................... 3

   B.   Background on the AHK Street Gang ......................................... 4

   C.   BROWN's support for ISIS .......................................................... 5

   D.   BROWN Recruited AHK Members and Others to Support ISIS ............... 6

   E.   BROWN's Plans to Travel to Syria to Join ISIS ......................... 8

   F.   BROWN's Communications with CS-3 and the UC Regarding ISIS ......... 9

   G.   BROWN Attempted to Provide Financial Support to ISIS ...................... 13

   H.   BROWN's First Attempt to Provide Financial Support to ISIS ............... 17

   I.   BROWN's Second Attempt to Provide Financial Support to ISIS ............... 19

   J.   BROWN's Third Attempt to Provide Financial Support to ISIS ............... 20

   K.   BROWN's Conspiracy To Distribute Marijuana ......................... 21

   L.   BROWN's Distribution of Fentanyl and Marijuana ..................... 26

   M.   Arrest Day Seizures .................................................................. 29

III.   Sentencing Guidelines Calculation .................................................... 33

   A.   Offense Level ............................................................................. 33

   B.   Criminal History Category ........................................................ 35

   C.   Anticipated Advisory Sentencing Guidelines Range ................. 35

IV.   Application of § 3553(a) Factors ........................................................ 36

   A.   Nature and circumstances of the offense .................................. 37

   B.   History and characteristics of the defendant ............................ 40

   C.   Reflect seriousness of the offense, promote respect for the law, and provide just punishment ............................................................................. 43

V.   Supervised Release ............................................................................. 44

VI.   Conclusion ........................................................................................... 44

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, hereby respectfully submits its Sentencing Memorandum to inform the Court of the government's arguments in support of a substantial but warranted sentence. BROWN's history of repetitive criminal convictions for controlled substances and firearms offenses, as well as second degree murder, coupled with his actions to support those an organization that seeks to commit terrorism against Americans and others makes him a multifaceted threat to society. For the reasons set forth below, the government requests that his Court sentence BROWN to a below Guidelines term of 360 months' imprisonment, a sentence supported by the factors to be considered under Title 18, United States Code, Section 3553(a). In addition, the government requests that his Court impose a five-year term of supervised release.

## I.   Procedural History

On November 13, 2019, defendant Jason BROWN was charged by complaint with attempted material support to ISIS. On February 26, 2020, a grand jury returned a three-count indictment charging BROWN with attempted material support to ISIS, in violation of Title 18, United States Code, Section 2339B. On February 24, 2021, a grand jury returned a nine-count superseding indictment charging BROWN with attempting to provide material support and resources, namely money in the amount of $500 and personnel, to a foreign terrorist organization, namely the Islamic State of Iraq and al-Sham ("ISIS"), knowing that the organization was a designated foreign terrorist organization, and that the

1

organization had engaged in and was engaging in terrorist activity and terrorism, in violation of Title 18, United States Code, Section 2339B (Counts One, Two and Three); conspiracy to possess with intent to distribute and distribute a controlled substance, namely, 100 or more marijuana plants, a Schedule I Controlled Substance, and a quantity of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (Count Four); distribution of a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethy-4-piperidinyl] propenamide), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (Count Five); distribution of a controlled substance, namely, a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (Count Six); possession with intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Section 841(a)(1) (Count Seven); felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1) (Count Eight); and possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, 924(c)(1)(A) (Count Nine).

On December 6, 2023, BROWN entered a plea of guilty to Counts One, Five and Nine of the superseding indictment. BROWN is scheduled to be sentenced on October 16, 2024.

As detailed below, BROWN is a convicted murderer with 26 prior convictions and was on supervised release when committed his most recent egregious and dangerous drug trafficking and firearms possession conduct. In addition, BROWN was fully aware, encouraging of, and financially supportive of the violence committed by ISIS. The sentence needs to reflect the repetitive and dangerousness nature of his conduct.

## II. FACTUAL BACKGROUND

### A. Summary

On three separate occasions in 2019, BROWN provided $500 to a confidential source (CS-3) with the intent that the $500 be wired to an individual BROWN believed was an ISIS soldier engaged in active combat in Syria and in need of financial resources, but who was actually an undercover law enforcement officer ("UC").

During that same time BROWN, while a leader of the AHK street gang, operated and directed a large-scale narcotics trafficking operation between California and the Chicago area and created a marijuana "grow-house" in California. As part of the narcotics trafficking operation, BROWN either drove the narcotics himself or used the United States Postal Service to mail large sums of cash, marijuana and fentanyl. Further, BROWN, a convicted felon and gang member, stored large sums of

cash, at least six handguns, various rounds of ammunition, and thousands of dollars' worth of narcotics between the home he shared with this wife and small children, his mother's home, his father-in-law's home and storage units.

Using a conservative estimate[1], BROWN possessed approximately 54,258 grams of marijuana, 107 grams of fentanyl and 1,415 grams of methamphetamine. More specifically and as described further below:

1) On October 15, 2019, BROWN possessed and mailed a package containing 5,000 grams of marijuana.

2) On November 1, 2019, BROWN possessed and mailed packages containing: 1,875.7 grams of marijuana, 1,863.2 grams of marijuana, 1,900 grams of marijuana and 1,900 grams of marijuana. As well as 107.3 grams of fentanyl contained in 993 blue pills stamped "M30."

3) On November 14, 2019, BROWN possessed 350 marijuana plants (Pursuant to Guideline § 2D1.1 Note (E), each plant is treated as 100 grams of marijuana, thus equaling 35,000 grams of marijuana), 6,713.16 grams of marijuana and 1,415 grams of methamphetamine. As well as a loaded Ruger Model P345 .45 caliber pistol, a loaded Glock 9mm caliber pistol, a loaded Sarsilmaz 9mm pistol, a loaded Glock .45 caliber pistol, a rifle magazine containing 18 7.62x39mm ammunition; a box containing 50 Winchester .40 caliber Smith & Wesson 180 grain hollow-point ammunition; a box containing 50 Winchester .40 caliber ammunition; a box containing 50 Luger 9mm caliber ammunition; and multiple firearm magazines and extended firearm magazines.

### B.    Background on the AHK Street Gang

The AHK street gang is based in Bellwood, Illinois, and traffics narcotics throughout the Chicago area. AHK is comprised of former members of the Black P-Stone, Gangster Disciples, and Four Corner Hustlers street gangs, many of whom have converted to Islam. The term "AHK" is an alternate spelling of the Arabic word

---

[1] As acknowledged in the Plea Agreement. Dkt. 115 at pages 8-11.

"akh," which means brother. BROWN is the leader of the AHK street gang in the Chicagoland area.[2]

### C.    BROWN's support for ISIS

In conversations with a confidential source ("CS-3"), BROWN regularly espoused his support of jihad[3], hijrah[4], Sharia law, and the Islamic State. As detailed below, BROWN stated his support of and admiration for the UC, who BROWN believed was an ISIS fighter.  BROWN further shared his affinity for violent ISIS videos, Shaik Faisal[5] lectures and literature, Faisal's Authentic Tauheed Paltalk chatroom, and made financial donations to Faisal.  BROWN further demonstrated this ideology as revealed by his own comments and his Dobbs Facebook Account[6]; and his actual financial donations to a person he believed was an ISIS fighter.

---

[2] See Government's Version Exhibits folder titled "AHK."

[3] Jihad is an Arabic word that literally means striving or struggling, but in the context of ISIS supporters, is commonly used to refer to a holy war, fight, or struggles against the enemies of Islam.

[4] Hijrah is an Arabic word meaning "migration," but is commonly used by ISIS to refer to ISIS-controlled territory for the purpose of joining or supporting ISIS to engage in violent jihad.

[5] Shaikh Abdullah Faisal (also known as Shaikh Faisal and Trevor William Forrest), was previously convicted in a British court for soliciting murder related to his encouragement of Muslims to fight and kill "kuffars." After his conviction and subsequent release from prison, Faisal continued to encourage violence and terrorist acts in his sermons, including in the pro-ISIS Paltalk chat room he operated, known as "Authentic Tauheed." On or about August 25, 2017, a New York state grand jury indictment was unsealed charging Trevor William Forrest, also known as Shaikh Abdullah Faisal, and Shaikh Faisal, with terrorism-related charges under New York State law. On or about December 5, 2017, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") named Faisal a Specially Designated Global Terrorist, pursuant to Executive Order 13224, based on Faisal's provision of support to ISIS. *See* https://treasury.gov/press-center/press-releases/Pages/sm0231.aspx

[6] See Government's Version Exhibits folder titled "Facebook Account."

In or around June 2016, BROWN was arrested[7] by state law enforcement in Clayton County, Georgia. Notably, while imprisoned, BROWN used[8] a hidden cell phone to continue his narcotics operation, view ISIS related content, and search for firearms. Following BROWN's arrest, a search warrant was obtained for several phones seized from BROWN. Among other things, the web history for BROWN's phone included over a dozen articles viewed from designated terrorist Shaikh Faisal's "Authentic Tauheed" website. For example, included in the web history for BROWN's phone were links to videos on the "Authentic Tauheed" website with the following titles: "11 RIE: The FIVE PILLARS OF TAUBAH By Shaikh Faisal," and "Note: Manhood in Islam-Shaikh Faisal."

### D. BROWN Recruited AHK Members and Others to Support ISIS

BROWN used his position as the leader of the AHK street gang to actively recruit and radicalize AHK members and others to support ISIS. For example, on or about January 15, 2019, a confidential source ("CS-2") had a conversation with AHK street gang member Individual TC in person. When talking about BROWN and other AHK members, Individual TC told CS-2:

> Bro, I'm gonna tell you. Anwar Awlaki and Sheikh Faisal al Jamaicaee . . . Like when I came home from the joint, they were sending each other [meaning BROWN] videos . . . like shit you ain't supposed to look at. You feel me? They

---

[7] As described below, BROWN was indicted in Clayton County, Georgia for unlawful possession of a firearm by a felon, to which he pled guilty and was sentenced to a term of 2 years' imprisonment. BROWN was released on parole on or about June 13, 2018. BROWN was on parole at the time he committed the instant offense. See Government's Version Exhibits folder titled "Georgia Records."

[8] See Government's Version Exhibits folder titled "Phones While Imprisoned."

talking about, doing, they teaching the shorties [young gang members] that they could do shit that I never heard nobody in my life say.[9]

In addition to CS-2, BROWN also attempted to recruit and radicalize CS-3. On or about January 21, 2019, BROWN sent CS-3 a link to designated terrorist Faisal's lecture entitled, "Why We Hate the Shia." On or about January 25, 2019, BROWN and CS-3 discussed topics such as Faisal's imprisonment in Jamaica and individuals who BROWN believed were false Islamic scholars because they lied about the religion, including BROWN expressing his desire to live in the Islamic State:

> My view point, you know what I'm saying ummm . .. Islamic State, sharia, jihad. You see what I'm saying. A lot of people say Al Sunnah al Jamat, but they don't talk about the sharia. They don't talk about jihad. They don't talk about hijrah. You see what I'm saying? They don't talk about, you know what I'm saying, the Islamic State.
> . . .
> I'm fixing to make Hijrah over there. I'm not gonna tell nobody [unintelligible]. Because sheikh tell ya though don't tell nobody. We plan on leaving. We plan on doing this.

On or about July 12, 2019, BROWN told CS-3, "I had sent the Shaikh [Faisal] money. You feel me? You know Sheikh supposed to be getting expedited [*sic*] here?" BROWN further told CS-3, "I think he lost it so he's gonna be coming here soon

---

[9] Anwar Al-Awlaki (a.k.a. Anwar Al Aulaqi, hereinafter, "Awlaki") was a dual citizen of the United States and the Republic of Yemen (hereinafter, "Yemen"). From in or around 2004 to 2011, Awlaki was a resident of Yemen. Awlaki used the Internet to post sermons and blog entries in which he justified conducting violent jihad against the United States, United States citizens, and United States military personnel, and attempted to radicalize and recruit followers to engage in violent jihad. On or about July 16, 2010, the United States Department of Treasury announced that Awlaki had been specially designated as a global terrorist under Executive Order 13224 as a "key leader" of AQAP and for "supporting acts of terrorism and for acting for or on behalf of AQAP." On or about September 30, 2011, Awlaki was killed in Yemen.

[Faisal lost his appeal of the order of extradition and will be extradited to the United States from Jamaica soon]."

### E. BROWN's Plans to Travel to Syria to Join ISIS

On or about January 25, 2019, BROWN told CS-3 that he was planning to make hijrah. More specifically, BROWN stated, "I'm fixing to make hijrah over there. I'm not gonna tell nobody. Because Shaikh [Faisal] tell ya though, don't tell nobody. We [BROWN and his family] plan on leaving. We plan on doing this." Notably, this statement about "hijrah" occurred after BROWN discussed "Islamic State" in his conversation with CS-3.

On or about March 6, 2019, CS-3 asked BROWN for clarity regarding the process of making hijrah. BROWN stated, "you gotta go where ahk [the ISIS brothers] and them at . . . and establish, you know what I'm saying, the state [the Islamic State]. You gotta establish the State . . . then you gotta have an army."

Acquiring land and establishing a government structure over the territory selected for the Islamic State, which was on the Syria-Iraq border, was vital to ISIS's stated goal of establishing a Caliphate with a Sharia Law system.[10]

BROWN did more than just talk about the idea traveling to join ISIS, he considered the ramifications and came up with a plan to make it happen. On or about March 8, 2019, BROWN told CS-3 that BROWN and his family were "ready to go."

---

[10] See, Cole Bunzel, *The Kingdom and Caliphate: Duel of the Islamic States*, Carnegie Endowment for International Peace, February 18, 2016, also available at https://carnegieendowment.org/2016/02/18/kingdom-and-caliphate-duel-of-islamic-states-pub-62810.

BROWN further stated that he knew he could not travel straight to Syria and that he believed that he would be imprisoned if he tried.

On or about April 12, 2019, BROWN said to CS-3, "If I go somewhere, Sheikh, out of the country, you know where I'm going, right? Mecca ... I'm going there first. Or I'm going where? Abu Jaffar! You hear me?" As discussed in further detail below, "Abu Jaffar" is the online persona of CS-3's purported cousin (who unbeknownst to BROWN was an FBI undercover employee (the "UC"), whom CS-3 and the UC represented to BROWN was a soldier fighting on behalf of ISIS in Syria. Here BROWN was declaring to CS-3 his intention to connect, in person, with "Abu Jaffar" (the UC), who he believed was an active ISIS soldier.

### F.    BROWN's Communications with CS-3 and the UC Regarding ISIS

On or about February 8, 2019, BROWN expressed to CS-3 an interest in obtaining women's Islamic clothing. CS-3 advised BROWN that CS-3 had a contact overseas, purportedly a cousin in Syria who sells such clothing.

On or about February 15, 2019, BROWN asked CS-3 about CS-3's contact overseas. CS-3 confirmed to BROWN that CS-3's contact was CS-3's cousin (the UC) and that he was fighting with ISIS. BROWN became excited to have a connection to an ISIS fighter, responded, "Oh brother, I knew it!" and gave CS-3 a fist bump. Knowing that it was illegal to support ISIS, BROWN then told CS-3 that he had been in contact with Faisal, a designated terrorist, on more than one occasion and that Faisal had warned BROWN to be careful. BROWN explained to CS-3 that Faisal was locked up because he had been talking to an informant. BROWN also referred to

beheading as an appropriate consequence for people who talk poorly about the prophet Mohammed, stating, "his head gotta go." Beheading is a violent tactic that has been used by ISIS members.

During the same conversation on February 15, 2019, BROWN told CS-3 about the necessity of owning a firearm and that one is "not a man" without a firearm. As noted below, BROWN, a career offender with convictions for second degree murder and firearms possession (for which he was still on probation at the time he made the declaration) did in fact possess several firearms and hordes of ammunition. BROWN strategically stashed these firearms throughout his residence and his mother's residence.

On or about February 22, 2019, while meeting with CS-3, BROWN again brought up the Islamic clothing. CS-3 noted that if BROWN bought them from the CS-3's contact, BROWN would be supporting a good cause [meaning ISIS]. BROWN responded, "Inshaallah" [an Arabic term for "God willing"].

On or about March 8, 2019, CS-3 told BROWN that the UC had sent CS-3 a video of ISIS fighters wearing tactical clothing shooting AK-47 style assault rifles. BROWN responded, "I be looking at all that stuff . . . every day . . . Islamic ahh, it's called ahh jihadiology . . . there's like ten-minute videos . . . they used to have videos like every day, like three, four videos."[11]

---

[11] The website "www.jihadology.net" is a website created by Aaron Zelin, an expert on global jihadism at The Washington Institute. Zelin archived all of the propaganda publicly available that was published by jihadist groups, including al-Qa'ida and ISIS.

Later during the same conversation, BROWN showed CS-3 another ISIS video, and told CS-3 that the video was approximately one hour long and showed ISIS "tearing the government officials up" after giving them a chance to repent. The video depicted machine gun fire and contained frequent mention of jihad. BROWN provided his own narration of this video to CS-3, describing how the fighters in the video burned their passports to show that they were not going back to their countries of origin. Based on BROWN's narration, BROWN was expressing to CS-3 that jihad overseas consisted of fighting with ISIS. More specifically, BROWN told CS-3, "it [jihad] cannot be done like it is in Syria. In the US [United States], jihad is done by spreading the word of Islam." BROWN meant "spreading the word of Islam" to mean radicalizing and recruiting others to support ISIS.

BROWN did not just regularly watch violent ISIS videos, he shared the ISIS videos and philosophy with AHK members, CS-3, and others, in an effort to recruit and radicalize them. BROWN viewed his work sharing ISIS videos and philosophy with other gang members and CS-3 as engaging in jihad while inside the United States.

On or about March 12, 2019, CS-3 told BROWN that the UC's son had died as a martyr in Syria. BROWN stated that the UC should be happy, meaning that the UC should be proud that his son died as a martyr for ISIS.

On or about April 3, 2019, CS-3 gave BROWN nine women's Islamic robes, which CS-3 represented were provided by the UC. BROWN appeared excited when he inspected the robes, stating that they were exactly what he was looking for. CS-3

then showed BROWN videos from the UC, in which the UC was purporting to be engaged in fighting with ISIS. BROWN excitedly praised God many times while watching the videos and expressed approval. BROWN wanted to connect directly with an ISIS fighter and downloaded an application ("Messaging Application 1") to one of his phones so that he could send messages directly to the UC. BROWN used the username "Farooq Al Amerki."

Approximately three days later, on or about April 6, 2019, the UC and BROWN engaged in a conversation over Messaging Application 1. Referencing the robes that the UC had provided to BROWN as a gesture of good will, BROWN stated:

> In sha Allah . . . all is well shukran [thank you] for the abayas [robes] . . . Aamen for the dua and May Allah straighten out your affairs and the brothers around u . . . It's such a blessing to hear from the brother who are only experiencing life as a Muslim . . . I'm jealous in a good way at your actions . . . They surely need to be acknowledged, praised and worship.

In this text, BROWN was stating that he was jealous of the UC, whom BROWN believed was a front-line ISIS fighter and believed those were the only individuals who were experiencing life as a Muslim.

On or about April 10, 2019, CS-3 showed BROWN another video of the UC purportedly fighting for ISIS in Syria. BROWN praised the UC's work fighting for ISIS claiming the UC will be rewarded in heaven.

On or about April 11, 2019, the UC exchanged messages with BROWN discussing a Faisal lecture and an article written by an individual within the Islamic

State who had been critical of Abu Bakr Al-Baghdadi[12]. The UC refuted the article and praised Faisal's teaching ability stating that it reminded the UC of Awlaki. BROWN responded, "Yes both are my shaikh," indicating that BROWN viewed both Faisal, (a designated terrorist) and Awlaki (the leader of ISIS) as his religious mentors.

On or about April 30, 2019, during a conversation between BROWN and the UC discussing a video which had been released by ISIS leader Al-Baghdadi the day before, BROWN again praised the commentary and provided a smiley face emoji as part of his response.

On or about July 26, 2019, BROWN told CS-3 that he supported following Sharia law and not democracy.

### G.    BROWN Attempted to Provide Financial Support to ISIS

On or about May 13, 2019, BROWN and CS-3 were driving in a vehicle together after eating lunch at a local restaurant. BROWN spontaneously told the source that he "gonna have something [money]" for the UC.

On or about May 23, 2019, BROWN again brought up the UC to CS-3 and asked CS-3, "When the last time you heard from, from the brother? Said . . . said he, said he needs some faloose [an Arabic word for money] didn't he?" CS-3 told BROWN that CS-3 had already provided "something [money]" to the UC. BROWN asked CS-3, "You send something?" and CS-3 responded, "He sent me a contact, and he said

---

[12] Abu Bakr Al-Baghdadi was an Iraqi militant and caliph of the Islamic State from 2014 until he killed himself and two children by detonating a suicide vest during a raid conducted by the United States in 2019.

erase it." BROWN then told CS-3, "Tell him [the UC] he need another one . . . He need another one I got something [money]. Got something for him [the UC]."

On or about August 9, 2019, BROWN mentioned to CS-3 that the UC had reached out and asked for money. BROWN wanted to help the UC but had not been able to find the right moment. BROWN further stated that he could not send money the way the UC requested because he could get in trouble for "aiding and evading."[13] BROWN believed they [law enforcement] were monitoring his financial activity. As described in further detail below, in August of 2019, BROWN, correctly, suspect law enforcement was monitoring his narcotics trafficking. BROWN suggested that he would give CS-3 money to give to the UC. CS-3 indicated concern that CS-3 may get in trouble for sending money to the UC. Undeterred, BROWN sought to alleviate CS-3's concerns and stated that CS-3 should not be alarmed because CS-3 had family in Syria so it would not be suspicious. BROWN admitted that he had previously sent money to "brothers behind the wall" [meaning ISIS fighters]. BROWN then instructed CS-3 to tell BROWN whatever amount of money CS-3 wanted from BROWN and BROWN would get the money to CS-3.

On or about August 14, 2019, during a meeting between BROWN and CS-3, the following occurred:

    1)    CS-3 stated, "I'm working on something for him [the UC], if you wanna, you said last time, let me know." BROWN responded, "I got something now,

---

[13] As acknowledged in the Plea Agreement, BROWN knew it was illegal to provide material support to ISIS. Dkt. 115 at page 6.

whenever." CS-3 confirmed, "Abu Jaffar [the UC], yeah?" BROWN responded, "Yeah, I got something! I got $2,500 right now. Inshaallah. Whenever, akh. That what my money go to. . ." CS-3 asked, "So you want me to send it with my stuff?" BROWN confirmed, "Yeah." CS-3 asked again, "You sure?" and BROWN said, "I'm positive."

2)      CS-3 then said, "I don't want to be pushy. I hate to be pushy." BROWN responded, "You ain't even gotta ask me them type of questions. Just be like, 'I'm finna send something,' and then I just, you know. Ain't even gotta. There's a certain way you talk. You see what I'm saying? [BROWN will provide money for the CS-3 to send to the UC and ISIS without CS-3 having to ask with specifics]." CS-3 stated, "Let me know when." BROWN responded, "I got something. I got the 25 [$2,500]."

3)      CS-3 explained, "They're going through some hard times and stuff." BROWN asked, "But you can't send it like all at once can you?" CS-3 responded, "No probably [unintelligible] $500, more than that it triggers [law enforcement scrutiny]. I had, I had sent some earlier, but I mean he, they're pushy and I don't blame them. You know what I mean? I don't blame them because, it is what it is [the UC and his fellow ISIS members are pushy in asking for financial support because they are in need of help]."

4)      BROWN later asked, "So what you want me to give you at, at first? $1,000? How you wanna do it?" CS-3 asked, "You wanna do it hundred, $500 at a time?" BROWN confirmed, "$500? Ok. I'm ready. Whichever way you gonna do it. You gonna send the whole 25 [$2,500], I'll give you the whole 25 [$2,500]." CS-3 rejected

that offer of $2,500 stating, "No, no I can't send the whole cause it triggers [law enforcement scrutiny]."

5)   Later in the conversation, BROWN stated, "then whatever the remainder I'm gonna give to you."  CS-3 asked, "You don't have anybody that could do it for you too?" BROWN responded, "To send it? . . . I could have somebody but it's just the whole point. . . I don't wanna put nobody in that type of business [BROWN does not want his people to take the risk]. . .  I got plenty of people, akh [brother]. I got all of Bellwood that I could sent to go do it. It just the fact that you know they would be questioned about it."

6)   BROWN further stated, "Like I told you it's already like, cause I done told them that them people [law enforcement] watching me." CS-3 asked, "Why do you think that?" BROWN responded, ". . . I had caught umm a pistol case. A gun charge. That's probably why you ain't seen me like when you first start coming around over there, cause I was locked up in Georgia. When I was locked up in Georgia, ya know AHK and them you know we make a transition from Muslim, gang banger to Muslim so now they [law enforcement] tryna say that we, we, we, we are gang bangers still. . . they said I'm the leader of umm AHK city. . ." CS-3 asked, "What's AHK city?" BROWN responded, "That's what they [law enforcement] call Bellwood."

7)   BROWN later stated, "Like I just say, you ain't even gotta tell me or say nothing about no name or none of that. Just be like, 'I'm finna to send money, you know what I'm saying, to charity.' We just talk like that. We ain't gotta talk like. Just, just be safe, akh [brother]. You know what I'm saying? But yeah, I got somebody to

16

send. Just like I used to send money to the, to the Shaikh. I had my niece go [unintelligible]. You see what I'm saying? But now . . ."

8)     Later in the conversation, BROWN instructed CS-3, "Don't let nobody else know what's going on [referring to sending money to the UC for ISIS]. Not even nobody but me and you, akh [brother]. Even though the people that be around me I try and be careful with who I be with, careful with who I bring around, where I be at. . . . I done been locked up. I done been through. I done have murders[14] and everything, akh, you see what I'm saying. So, I ain't just [unintelligible] I wouldn't be here right now if I would've told on myself."

**H.     BROWN's First Attempt to Provide Financial Support to ISIS**

On or about August 16, 2019, during a meeting between BROWN and CS-3, the following occurred:

1)     CS-3 told BROWN that CS-3 intended to send money to "Abu Jaffar" (the UC) soon. More specifically, CS-3 stated, "I'm gonna go now and send him money." BROWN responded, "You ready?" CS-3 stated, "Yeah. I'm gonna send him some today." BROWN responded, "Oh ok." BROWN looked down and counted out money under the table. BROWN then stated, "Well you can put this one on me." CS-3 reminded BROWN, "Just give me five hundred. No more. Cause I got five [$500]. Want me to tell him? Or . . .no? Tell Abu Jaffar [the UC] it's from you or no?"

---

[14] On or about December 29, 2005, BROWN was convicted of second-degree murder in the Circuit Court of Cook County, Illinois, in Case Number 05C44015101.

2)     BROWN responded, "Allah knows," as he pointed his middle finger up in the air and smiled, before handing CS-3 $500 in $20 bills across the table for CS-3 to send to the UC in support of ISIS. BROWN further stated, "That's the only one that needs to know [meaning Allah] as long as they get it. That's it. . . . He'll find out on, on that day." CS-3 confirmed that BROWN did not want CS-3 to tell the UC that the financial support was from BROWN by asking, "Well I mean I shouldn't tell him, it's from you?" BROWN responded, "No, Sheikh." CS-3 stated, "Up to you, it's your choice. . . . I know he asked you, so . . ." BROWN confirmed, "Oh yeah. You ain't gotta say my name." CS-3 confirmed, "Ok."

The following is a still image from the videorecording made of CS-3's meeting with BROWN on or about August 16, 2019, in which BROWN can be observed holding the $500 in cash and pointing his finger up in the air, while stating that "Allah Knows.":



## I.     BROWN's Second Attempt to Provide Financial Support to ISIS

On or about September 6, 2019, CS-3 showed BROWN a picture that purported to be from "Abu Jaffar" (the UC), and stated, "Look how happy this brother [referring to a purported ISIS fighter in the picture]. He got dressed up now. He's got all his gear on him now . . . because of last time [referring to the last time BROWN gave CS-3 money for "Abu Jaffar"]." BROWN responded, "Yeah? Of last time? Oh ok ok ok. For sure." CS-3 stated, "And I think the the brother [purported ISIS fighter] had a feeling, he's like tell him to thank you . . . He sent you a verse." BROWN read the purported verse of Islamic writing sent by "Abu Jaffar," and then stated, "I mean . . . for sure. That's what's up," while giggling.

As the conversation continued, CS-3 told BROWN, "I mean I go every week [sending money to 'Abu Jaffar']. I don't want to push you. Whatever." BROWN responded, "I'm ready. I give you all tens [ten-dollar bills]." BROWN began to take out money to give to CS-3, but CS-3 asked for BROWN to wait because he was driving.

Later in the conversation, CS-3 clarified that the person in the photo was "one of the brother that got the stuff. That he's dressed up because of what we sent [money BROWN gave to CS-3 to send to the purported ISIS fighter in August 2019]. That's what he said. You know what I mean?" BROWN responded, "That's great. It don't get no better than that, Ahk [brother]."

After arriving in Bellwood, Illinois, BROWN exited CS-3's car and left money behind in the vehicle. CS-3 asked BROWN "Is this for ahh the brothers [ISIS

19

fighters]?"  BROWN responded, "That's for you.  Yeah."  CS-3 counted the money in front of BROWN, which totaled $500.

### J.      BROWN's Third Attempt to Provide Financial Support to ISIS

On or about October 4, 2019, CS-3 told BROWN, "Oh I'm doing some donation today to the brothers [purported ISIS fighters]. You told me to tell you so."  BROWN responded, "Ok.  I got some ahh.  I got something [money] on me.  It's in the ahh . . . it's in the car.  I only got like some tens on me right now, but I got it [more money] in the car.  I'm finna come to your shop [where CS-3 works] anyway."  BROWN then pulled out money and counted it in front of CS-3 but put the money back into his pocket.

Later that day, BROWN met with CS-3 at his place of business and BROWN pulled out cash and began to count it in front of CS-3. BROWN then handed the bills to CS-3, who counted it.  CS-3 asked BROWN, "Why did you give me 26?" BROWN responded, "Oh it's 26? It costs to send too [referring to giving CS-3 extra money to cover the cost of sending the money overseas] don't it?"  CS-3 then asked BROWN, "This is for ahh . . . the sake of Allah [unintelligible]?" BROWN responded, "Yeah." CS-3 stated, "You gotta say that because it might, it might, it may seem like, you know, you're paying me for the cars [referring to other business between CS-3 and BROWN]." BROWN, while laughing and shaking his head from side to side, responded, "No, that's not for the cars.  I'll pay you probably like next week for the cars."

20

### K.    BROWN's Conspiracy To Distribute Marijuana

In June 2018 BROWN was released from prison after serving a sentence for unlawful possession of a firearm by a felon[15] and immediately began trafficking in narcotics again[16]. Upon his release, and while on felony probation, BROWN ran and directed a sophisticated narcotics operation transporting narcotics from California to stash house locations in Illinois.

For example, in a span of just five months, from June 2018 to November 2018, BROWN and/or his wife, Phuong, made at least 28 trips to and from California. During the majority of these trips, BROWN and/or Phuong flew to California and then rented cars to return to the Chicago area with narcotics.  Often upon returning, BROWN would make several trips to a storage unit located at 1245 South Highland Avenue in Lombard, Illinois ("Storage Unit 1") where he moved large containers containing narcotics in and out of the storage facility.

BROWN's marijuana supplier, A.E., lived in California and said[17] BROWN purchased approximately 30 pounds of marijuana every 3-4 months from A.E. since the summer of 2018 (BROWN was released from Georgia prison in June 2018). BROWN paid approximately $40,000 to $45,000 in cash for each purchase. A.E. further said BROWN would ship smaller quantities of marijuana to Chicago and

---

[15] On or about September 29, 2016, BROWN was convicted of unlawful possession of a firearm by a felon in the Circuit Court of Clayton County, Georgia, in Case Number 16CR02024-10 and sentenced to 2 years' imprisonment and 3 years' probation.

[16] BROWN has a 2001 and 2007 conviction for manufacture/delivery of a controlled substance, and seven convictions for possession of a controlled substances between 2001-2013.

[17] See Government's Version Exhibits folder titled "A.E. Interview."

drive the larger quantities of marijuana back to Chicago. In September 2019, BROWN told A.E. that BROWN intended to start a marijuana "grow" operation in California. In addition to the 28 trips between June and November 2018, BROWN and others trafficked narcotics from California to the Chicago area as detailed below.

### 1. BROWN's Narcotics Trafficking From December 29, 2018, Through January 5, 2019

On December 29, 2018, BROWN and Phuong drove to California and on December 31, 2018, while in California, Family Member A received $2,500 from a Walmart-2-Walmart Money Transfer Service[18] initiated from a Walmart located in Northlake, Illinois from D.P., an AHK street gang member and BROWN relative. The next day, January 1, 2019, D.P. sent $2,500 from the Northlake Walmart to BROWN via the Walmart-2-Walmart Money Transfer Service.

On or about January 5, 2019, BROWN was back in Chicago and deposited four large bags at Storage Unit 1 and then departed a few minutes later with one bag that also appeared to be full. Below is a still photo taken by surveillance during this period:

### 2. BROWN's Narcotics Trafficking From January 14, 2019, Through January 29, 2019

On January 14, 2019, BROWN flew from Chicago to California. The next day, D.P. again sent $2,000 from the Northlake Walmart to BROWN via the Walmart-2-Walmart Money Transfer Service. Two days later, on January 17, 2019, BROWN flew

---

[18] According to Walmart, Walmart-2-Walmart money transfer is an international money transfer business, facilitated by the provider Ria Money Transfer, that allows a customer to walk into a Walmart, specify the amount for transfer, and within minutes have the money available for pickup at any Walmart store specified.

from California to Chicago. On January 20, 2019, BROWN went to Storage Unit 1 and pulled a large suitcase out of back seat of a BMW. BROWN went inside the storage facility and returned a short time later with a full suitcase and placed it in the trunk of the BMW. BROWN went to the back seat of the BMW a second time, got a backpack, emptied the contents, took the backpack inside the storage facility and returned a short time later with the backpack, now full, and placed it in trunk. BROWN went to the back seat of the BMW a third time, and pulled out a large empty duffel bag, placed the bag near the front of storage locker, and departed.

Five days later, during the evening of January 25, 2019, BROWN went back to Storage Unit 1 removed a large black duffel bag and placed it in the back seat and departed. The next day, January 26, 2019, BROWN and Phuong arrived at the unit and Phuong made numerous trips from Storage Unit 1 to the vehicle before departing.

Three days later, January 29, 2019, BROWN, using a different vehicle, returned to the storage facility and loaded two large travel bags into his vehicle before leaving.

### 3.     BROWN's Narcotics Trafficking From February 26, 2019, Through March 20, 2019

On February 26, 2019, BROWN flew from Chicago to California, and then drove to Murrieta, CA, where A.E., his marijuana supplier operated an unlicensed marijuana dispensary. On March 2, 2019, BROWN began traveling eastbound from California to the area of Chicago. Later that month, on March 23, 2019, BROWN drove back to California, this time with Family Member A.

### 4. BROWN's Narcotics Trafficking From April 2019 Through August 2019

On April 15, 2019, BROWN flew from Chicago to California and three days later started driving eastbound from California towards Chicago. The next day, April 19, 2019, Family Member A put a black duffel bag into Storage Unit 1, retrieved a green container with a red lid, and drove westbound from Chicago to the Denver area where she met BROWN. BROWN arrived in the Chicago area on April 21, 2019, the very next day BROWN entered Storage Unit 1 with the same green container with a red top.

After driving from California to the Chicago area BROWN flew back to California two days later. After only staying for a few days, BROWN flew back to Chicago on April 29, 2019. The next day, on April 30, 2019, BROWN placed a small black bag and a large black duffle bag into Storage Unit 1.

On May 14, 2019, BROWN and D.P. flew from Chicago to California on separate flights. On May 19, 2019, D.P. returned to Chicago from California. The next day, on May 20, 2019, surveillance observed D.P. at a different storage unit. On May 22, 2019, BROWN flew back to Chicago. The next day BROWN went to Storage Unit 1 and removed a small black bag.

On May 30, 2019, BROWN flew from Chicago to California. On June 1, 2019, Family Member A and their four children flew to California. BROWN and Family Member A started driving back towards Chicago the next day. On June 5, 2019, BROWN drove to Storage Unit 1. BROWN then made three trips from the trunk of his vehicle and placed approximately five large bags into Storage Unit 1.

24

BROWN made similar trips to and from California with subsequent drop-offs of large bags at the storage facility three more times in June of 2019. BROWN made another two narcotics trafficking trips from California to the storage facility in July 2019.

During the first week in August 2019, BROWN and Family Member A flew to California and returned via car. This time, however, Family Member A flew back to Chicago, then flew to Denver where she rejoined BROWN for the drive back to Chicago in a new car that BROWN rented, all of which indicates an effort to evade detection by law enforcement.

Throughout August 2019, BROWN made several more trips to and from California with subsequent deposits at the storage facility. BROWN also continued to exhibit counter-surveillance techniques, including switching vehicles, changing locations, and driving in tandem with other members of the AHK street gang, in order to evade law enforcement.

On August 29, 2019, BROWN stopped next to a law enforcement surveillance vehicle at a stop light and began yelling at the driver, and asked, "Why are you and your five other buddies following us," indicating that he was surveillance conscious and aware that he was under surveillance.

Thereafter BROWN changed his methods, BROWN stopped traveling to Chicago from California via car after August 2019. However, as detailed below, and as BROWN's marijuana supplier reported, beginning in October 2019, BROWN

began using the United States mail to transport narcotics and narcotics proceeds to Chicago and California.

### L.     BROWN's Distribution of Fentanyl and Marijuana

During the course of the investigation, BROWN and an individual, C.D. operated two California locations one as a marijuana grow-house, hereinafter the Dainty stash house and Willowglen grow-house from at least August-November 2019.

Notably, BROWN departed from the Willowglen grow-house before mailing packages containing cannabis and fentanyl on October 15, 2019, and November 1, 2019, detailed below. More specifically, on October 14, 2019, BROWN departed the Willowglen grow-house; and on October 15, 2019, parcels containing cannabis were mailed from Menifee, California, which is (according to Google Maps) approximately a 30-minute drive away from the Willowglen grow-house.

As charged in Counts Five and Six, on November 1, 2019, BROWN departed from the Willowglen grow-house while carrying a bag. That same day, parcels containing fentanyl and cannabis were mailed from Murrieta, California, which is (according to Google Maps) approximately a 45-minute drive away from the Willowglen grow-house.

### 1.     Seizure of Approximately $100,000 Cash Mailed to the Dainty Way Stash House

On October 8, 2019, a narcotics canine in a United States Postal Service ("USPS") facility alerted to a mail parcel addressed to "Jason Brown, 1905 DAINTY WAY, HEMET, CA 92545-8960," the Dainty Way stash house.  The parcel had no

26

return address listed, but was mailed from the Glen Ellyn, Illinois Post Office (which, according to Google Maps, is approximately 2.6 miles from BROWN's residence).

Video from the kiosk where the parcel was mailed, shows BROWN trying to conceal his activities by covering the camera on the kiosk with what appears to be a piece of paper. Additionally, BROWN signed up for text alerts on the parcel. The parcel contained approximately $100,008 in rubber-banded United States currency, depicted in the photo below:



**2.      Seizure of Approximately 5 Kilograms of Marijuana**

On October 15, 2019, BROWN mailed a total of 10 packages from post offices in Murrieta and Menifee, California to himself. More specifically, BROWN mailed the parcels from a self-service kiosk at the post offices. BROWN again tried to mask his identity by holding paper over the kiosk's camera (in the same manner as the cash mailing noted above).



Four parcels were mailed from the Murrieta post office to BROWN's residence; three parcels were mailed from the Menifee post office to BROWN's mother's address; and three parcels were mailed from the Menifee post office to his father-in-law's residence.[19] The packages had over 5 kilograms of marijuana spread across the three parcels, as depicted below:



### 3.   Seizure of Fentanyl (Count Five) and Marijuana (Count Six)

On November 1, 2019, BROWN mailed at least five more parcels from a self-service kiosk in a post office in Murrieta, California, again while holding what appears to be a piece of paper over the kiosk's camera (in the same manner as the two mailings discussed above), as seen in this still image from the kiosk video:

---

[19] As detailed below, search warrants at these locations revealed narcotics, large sums of cash and firearms.



Three of the parcels were addressed to BROWN's father-in-law's residence, and the other two parcels were addressed to BROWN's residence.

The parcels addressed to BROWN's father-in-law's residence contained the following: (1) 1875.7 grams of marijuana; (2) 1863.2 grams of marijuana; and (3) 107.3 grams of fentanyl contained in 993 blue pills stamped "M30."

The other two parcels addressed to BROWN's residence contained approximately 1.9 kilograms of marijuana each.

### M.   Arrest Day Seizures

On November 14, 2019, the day of BROWN's arrest on the terrorism-related charges, agents executed search warrants at numerous locations used by BROWN to store narcotics, narcotics proceeds, firearms and ammunition.

### 1.   BROWN's Residence

BROWN and Family Member A lived on West Harrison in Lombard, Illinois with their children. During the search[20] of BROWN's residence, agents seized, among

---

[20] Photos and a list of items seized are detailed in the Government's Version Exhibits folder titled "BROWN Residence."

other items, approximately $264,310 in narcotics proceeds, an electronic money counter, a digital scale, and 1,415 grams of methamphetamine. Agents also recovered, a military style vest, various magazines for handguns and a rifle, significant amount ammunition, and the following firearms:

**A)** a loaded Ruger Model P345 .45 caliber pistol, bearing serial number 665-01473 (found under kitchen sink);

**B)** a loaded Glock 9mm caliber pistol, bearing serial number KBS192 (found wrapped in coat next to front door, which was within arm's reach of BROWN when he opened the door after agents knocked and announced the search warrant);

**C)** a loaded Sarsilmaz 9mm pistol, bearing serial number T1102-15G01324 (found in safe);

**D)** a loaded Glock .45 caliber pistol, bearing serial number WFA-396 (found inside safe);

**E)** a rifle magazine containing 18 7.62x39mm ammunition (found in basement crawlspace);

**F)** a box containing 50 Winchester .40 caliber Smith & Wesson 180 grain hollow-point ammunition (found in basement crawlspace);

**G)** a box containing 50 Winchester .40 caliber ammunition (found under kitchen sink);

**H)** a box containing 50 Luger 9mm caliber ammunition (found in sock drawer); and

I) multiple loaded magazines and extended magazines (found in dressers drawers and gun cleaning case).

In his plea agreement, (Dkt. 115 at page 10), BROWN acknowledged that the methamphetamine and firearms found in his house were part of his drug distribution business. Even further, BROWN admitted that he possessed the firearms in the safe in order to better secure his narcotics and protect himself and his narcotics from being stolen or taken without his permission.

### 2. BROWN's Mother's Residence

During the execution of the search warrant[21] at BROWN's mother's residence located on Linden Avenue in Bellwood, Illinois, agents discovered two .357 Magnum revolvers, several rounds of various caliber ammunition, an electronic money counter, narcotics packaging materials, a digital scale and multiple bags or containers of narcotics, including 1.9 kilograms of pills and approximately 92.5 lbs. of marijuana. This is the only time BROWN involved his mother in his narcotics trafficking, as noted above, BROWN previously mailed packages full of marijuana from California to his mother's address.

---

[21] Photos and a list of items seized are detailed in the Government's Version Exhibits folder titled "BROWN's Stash House at Mother's Residence."

### 3.   BROWN's Father-In-Law's Residence

During the execution of the search warrant[22] at BROWN's father-in-law's residence located on Linden Boulevard in Bellwood, Illinois, agents discovered $164,310 in cash in a Spiderman lunch box stored in a safe located in a hallway closet.

BROWN's father-in-law immigrated from Vietnam to the United States as a refugee with his wife in 1975 and has lived in the residence since 1986.  He knew BROWN has been convicted of crimes but stated he did not know anything about his ongoing criminal conduct.  Further, he did not know that the safe was in his closet and has never seen the $164,310 found in the safe. He said that Phuong received packages at his house frequently (about 2-3 per week over the 4-5 months preceding the search), which he agreed to let her do, but did not open.

### 4.   BROWN's Stash House on Dainty Way

During the execution of the search warrant[23] at the Dainty Way stash house, agents discovered a narcotics packaging room, including black tape, heat wrap, a heat wrap packaging machine, various USPS packaging material, and a brown FedEx box bearing a sticker with the name "(C.D.), 1905 Dainty Way, Hemet, CA 92545." Next to the box was a black suitcase containing 13 vacuum sealed packages containing approximately 27.8 lbs. of marijuana.

---

[22] Photos and a list of items seized are detailed in the Government's Version Exhibits folder titled "BROWN's Stash House at Father-In-Law's Residence."

[23] Photos of items seized are detailed in the Government's Version Exhibits folder titled "Dainty Way Stash House Photos."

### 5. BROWN's Grow-House on Willowglen

During the execution of the search warrant[24] at the Willowglen grow-house, agents discovered a total of approximately 350 marijuana plants, including: 30 plants in bedroom one; 9 plants in bedroom two; 96 plants in the living room; 215 plants in the bathroom, and the use of grow lights (such as the Spydr 2i, which costs approximately $1,500 each) throughout. Agents also discovered approximately 14.8 lbs. of dried marijuana in the closet.

## III. SENTENCING GUIDELINES CALCULATION

The Government agrees with Probation that the Guideline range is 420 months to life imprisonment. Presentence Investigation Report (PSR) ¶ 223.

### A. Offense Level

Pursuant to Guideline § 2M5.3(a) the base offense level for Count One and related conduct is 26. The government agrees with Probation that the offense level is increased by 2 levels, pursuant to Guideline § 2M5.3(b)(1)(E), because the offense involved the provision of funds with the intent, knowledge, or reason to believe that the funds were to be used to commit or assist in the commission of a violent act. PSR ¶ 49. The government agrees the offense level is increased by 12 levels, pursuant to Guideline § 3A1.4(a), because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism. PSR ¶ 50. Thus, the adjusted offense level is 40. PSR ¶ 53.

---

[24] Photos of items seized are detailed in the Government's Version Exhibits in the folder titled "Willowglen Grow-House Photos."

The government agrees with Probation that pursuant to Guideline §§ 2D1.1(a)(5) and 2D1.1(c)(4), the base offense level for Count Five is 32, because the converted drug weight of the total quantity of narcotics for which defendant is accountable, approximately 54.25 kilograms of marijuana, 107.3 grams of fentanyl, and 1.415 kilograms of methamphetamine is at least 3,000 kilograms but less than 10,000 kilograms of converted drug weight. PSR ¶ 54. The government also agrees with Probation that the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance and therefore the offense level is increased by two levels. PSR ¶ 59. Thus, the adjusted offense level is 34.[25] PSR ¶ 63.

The government agrees with Probation that the guideline sentence for a violation of 18 USC 924(c), Count Nine, is the term of imprisonment required by statute, which is at least five years up to life. PSR ¶ 64.

The government further agrees that pursuant to § 3D1.4, the combined adjusted offense level is 41. PSR ¶ 68.

Additionally, the government agrees that the defendant is a career offender, however, no additional points are applied pursuant to §§ 4B1.1(a) and (b) because the otherwise applicable offense level determined under Chapters Two and Three is greater. PSR ¶ 69.

---

[25] The government agrees with Probation that defendant possessed at least four firearms in connection with his drug trafficking activities. However, according to Application Note 4 of § 2K2.4, because defendant is also convicted of possession a firearm during a drug trafficking crime, specific offense characteristics are not applied. PSR ¶ 55.

34

Therefore, after acceptance of responsibility, the government agrees with Probation that the total offense level is 38.  PSR ¶ 72.

## B.    Criminal History Category

Defendant has 12 criminal history points based on criminal convictions plus one additional point because the defendant was on parole at the time of the instant offense for a total criminal history score of 13, placing defendant in criminal history category VI.[26]

Because the conviction in Count One involved a federal crime of terrorism, the criminal history category is VI.  PSR ¶ 121.

Because defendant has at least two prior felony convictions of either a crime of violence of a controlled substance offense, he is a career offender and his criminal history category is VI.  PSR ¶¶ 69, 120.  More specifically, defendant has one prior felony conviction for a controlled substance offense (Circuit Court of Cook County, Docket No. 01 CR 0221601) and one prior felony for a crime of violence, murder, (Circuit Court of Cook County, Docket No. 05 C 44015101).

## C.    Anticipated Advisory Sentencing Guidelines Range

Pursuant to 18 USC 2339B, the maximum term of imprisonment for Count One is 20 years.  PSR ¶ 222.  The minimum term of imprisonment for Count Five, pursuant to 21 USC 841(a)(1) and (b)(1)(B), is five years and the maximum term is 40 years.  *Id.*  Count Nine carries a minimum term of five years, and maximum term

---

[26] Probation calculated 13 criminal history points.  PSR ¶ 117.  However, since the filing of the PSR, defendant expunged the case in ¶ 112, which was assessed one criminal history point.

of life imprisonment.  *Id.*  The term of imprisonment on Count Nine must be imposed consecutively to any other counts.  *Id.*

Thus, based upon a total offense level of 38 and criminal history category of VI, the defendant's Guideline range is 360 months to life.  PSR ¶ 223.  The government agrees with Probation that since the defendant is a career offender who is also convicted of 924(c), pursuant to §§ 4B1.1(c)(2)(A) and 5G1.2(e), the applicable guideline range is 420 months to life.  *Id.*

## IV.  APPLICATION OF § 3553(A) FACTORS

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[27] In order to determine the sentence to impose, the court must consider the statutory factors listed in 18 U.S.C. § 3553(a)(1)-(7).  One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements.  18 U.S.C. § 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). For the reasons set forth below, a review of the factors set forth in 18 U.S.C. § 3553(a) makes clear that a term of imprisonment of 360 months', is warranted and appropriate.

---

[27] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

A. **Nature and circumstances of the offense**

From supporting terrorism to trafficking deadly narcotics to stockpiling firearms, BROWN's criminal behavior has no bounds. The wide scope of BROWN's offense conduct is extremely serious and warrants a significant term of imprisonment.

BROWN deliberately attempted to assist an extremely violent terrorist group he knew was engaged in a wide range of atrocities. Not only was the defendant aware of these atrocities, he also celebrated them, gleefully watching ISIS fighters engaged in battle and sharing such ISIS propaganda.

When an opportunity to support ISIS surfaced, BROWN happily provided funds and indicated he would continue to fund ISIS fighters in Syria at any time. While controlling the Islamic State area of Iraq and Syria, ISIS continued to engage in the expected conduct of a violent terrorist organization. ISIS routinely carried out killings and deliberate targeting of civilians; mass executions; persecution of individuals and communities based on their religion, nationality, or ethnicity; kidnapping of civilians; the enslavement of adults and children from the Yazedi minority; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence.[28] ISIS recruited thousands of foreign fighters from across the globe to assist with its efforts to

---

[28] See, https://www.ap.org/explore/a-savage-legacy/.

continuously expand its territorial control in Iraq and Syria.[29] As a result, tens of thousands of radicalized persons and extremists traveled from all over the world to the Middle East to join ISIS.[30]  The government recognizes that at the time of the government's engagement with BROWN, as much as he desired to support ISIS, BROWN was not actively plotting to either travel to join ISIS, looking to facilitate travel for others, or assisting in a known terrorist attack in the United States. Instead, BROWN did his part by supplying the CS with money to be sent to the "brothers" fighting on behalf of ISIS.  As the Supreme Court has stated, "[t]he material-support statute is, on its face, a preventive measure- it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010).

---

[29] See, *ISIS and the Threat from Foreign Fighters: on House Hearing, Before the Subcomm. On Terrorism, Nonproliferation, and Trade,* 113rd Congress, p. 11-13 (2014).

[30] ISIS has also claimed credit for many terrorist activities, including attacks against Americans in the United States and against Westerners abroad. ISIS supporters have claimed responsibility for the following attacks in the United States: the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California, at the Inland Regional Center; the June 2016 shooting in Orlando, Florida, at the Pulse nightclub; the October 2017 West Side Highway truck attack; and the December 2017 attempted bombing of the 42 Street-Port Authority Bus Terminal. ISIS and its supporters have also claimed responsibility for many violent attacks in Europe and South Asia, including: the November 2015 shootings and suicide bombings in Paris, France, at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; and the August 2017 van attack in Barcelona, Spain. Though such terror attacks also occurred before 2015 and received widespread publicity.

BROWN truly believed in the cause of ISIS and was not showing bravado or playing a role or trying to impress the CS in his support of ISIS. When given the opportunity to take credit for his financial support to the ISIS fighters, BROWN declined and said, "Allah knows" meaning BROWN believed that his efforts to assist in terrorist violence would be rewarded by a higher power. This behind-the-scenes support allows terrorism to thrive.

At the same time he was funneling money to ISIS, BROWN was running a drug trafficking operation that spanned nearly the entire United States. BROWN used a variety of methods, which he protected with firearms, to operate his narcotics business. At times BROWN drove the narcotics from California to the Chicagoland area or had his wife traverse the United States with narcotics and/or narcotics proceeds. BROWN even mailed marijuana, fentanyl and narcotics proceeds to himself. Fentanyl is now the leading cause of drug poisoning deaths in the United States and, according to the DEA[31], .002 grams, the amount on the tip of a pencil, can be enough to kill the average American. On at least one occasion, BROWN put 993 fentanyl pills for a total of approximately 107.3 grams in the mail system and thereby subjected countless lives to the danger of fentanyl exposure.

The 993 fentanyl pills BROWN possessed were especially deadly because their future victims would not even know that they were ingesting fentanyl. The M30 stamp on the pill was meant to imitate Oxycodone and the pills were shaped and colored to look like pills sold at pharmacies.

---

[31] *See*, One Pill Can Kill | DEA.gov last visited September 17, 2024.

Drug dealing and narcotics trafficking are extremely serious offenses that rip at the very fabric of communities, often leading to violence and longstanding cycles of addiction. Moreover, this addiction often causes users to engage in additional crime – both petty and serious – to support their habit. Narcotics distribution plays an essential role in the drug trade, and the extreme violence prevalent in several communities in this District can often be tied directly back to the illicit drug trade.

BROWN has demonstrated that he will do just about anything to protect his drug trade. With the help of others, BROWN transported narcotics across the country and stored them in both a storage locker stash house, his mother's house and his home that he shared with his wife and small children. What makes BROWN exceptionally dangerous is that despite being a multi-convicted felon for firearms and murder, he possessed numerous firearms and hordes of ammunition. BROWN kept his firearms close by to protect his drugs, including hiding one firearm in a coat at the entrance to his house.

The severity of the crimes and the grave consequences that BROWN sought to inflict on others warrants a significant term of imprisonment.

### B. History and characteristics of the defendant

BROWN now stands convicted of a terrorism related offense, narcotics and firearms possession. As his criminal history shows, BROWN has earned the enhancement as a career offender. His criminal history started more than two decades ago, in August of 1997, when he was a 15-year-old juvenile adjudicated delinquent for the offense of theft. PSR ¶ 80. Since that time, defendant sustained

six additional juvenile adjudications including serving approximately 6 months in custody for a pair of delivery of cannabis adjudications. PSR ¶¶ 80-86. BROWN's juvenile history did not deter him, he went on to be convicted of 26 adult offenses, including eight felonies, one of which was murder. PSR ¶¶ 87-168. Ten of his convictions involve possession of a controlled substance allegations. Two of his prior convictions involve the discharge of a firearm, of which one resulted in the death of another person. PSR ¶¶ 100, 104.

BROWN's history demonstrates his dangerousness. He cannot blame youthful transgression. After seven felony convictions and serving time in prison, BROWN, at 34 years old, was still trying to obtain illegal firearms. PSR ¶ 116. Further, not one of defendant's prior convictions served as the wakeup call he needed. BROWN continued to commit crime and often times while still on probation or supervised release from a prior sentence. In the instant case, instead of abiding by the law at a time when he was on supervised release and should have been on his best behavior, he continued his narcotics business, which he protected with multiple firearms, and expanded his criminal activity to material support for terrorism. Just over a year after being released from prison, and still on supervised release, BROWN started giving money to support ISIS.

Even while locked up BROWN cannot conduct himself in a lawful manner or comport with rules. While in custody for the instant case BROWN has been discipled by the Bureau of Prisons seven times. PSR ¶ 11. While in custody in Georgia for attempting to obtain a firearm by a convicted felon, BROWN obtained an illegal cell

phone. If that was not aggravating enough, he used the phone to continue his narcotics operation, search for firearms and watch violence in support of terrorism.

BROWN made his philosophy known to the UC when BROWN said one is "not a man" without a firearm and that the head of someone who speaks poorly of the prophet Mohammed "gotta go" (meaning the person should be decapitated).

BROWN is consumed with ISIS. As he told the CS, BROWN looks at ISIS videos every day and as demonstrated by a review of a contraband phone he had while in custody, not even prison time has stopped him from feeding his desire to support ISIS, obtain firearms and operate his cross-country drug operation. Simply put, BROWN's support of violence has no limits, and has not been deterred by law enforcement or courts.

The government recognizes that BROWN had a traumatic childhood including abuse, a lack of a positive father figure to assist in guiding him and going to extreme measures to get attention. PSR ¶¶ 179, 18 ,193. BROWN also reports having been shot. PSR ¶ 190. He further reports that at this time he has a supportive family. Yet, despite that, BROWN knowingly and willfully decided to jeopardize those relationships by committing the criminal conduct for which now stands convicted. BROWN's involvement in these crimes is not a "one-off." It gives the government great pause that after having been sentenced to imprisonment 11 times over the course of roughly two decades that defendant had no qualms returning to his drug trafficking and firearm possession ways. Even more troubling, BROWN expanded his criminal activity to support of terrorism. Defendant is now a 42-year-old man,

when many aged out of illegal conduct. The fact that he stands before the Court approximately 27-years since he was first adjudicated a delinquent minor and roughly 24 years since his first adult felony conviction, gives the government great concern that defendant continues to pose a high risk of recidivism. Defendant's continued cycling in and out of the criminal justice system combined with the facts and circumstances of the instant case justify and warrant a term of imprisonment of 360 months' imprisonment.

### C.   Reflect seriousness of the offense, promote respect for the law, and provide just punishment

Deterrence is an important factor in this case. As referenced above, defendant's criminal history stretches back more than two decades. Instead of leaving crime in his past and abiding by the law, his uninterrupted pattern of criminal convictions shows that he never left his life of narcotics distribution and firearms possession and expanded to support of terrorism. In short, defendant's behavior demonstrates a lack of respect for the law, the court system, and the community at large, and a sentence of 360 months' imprisonment is warranted to show defendant that his flagrant disregard of the law will not be tolerated.

Moreover, it is equally important that defendant's sentence reflect the need for general deterrence. Providing support to a terrorist group is a very serious offense and combatting such support is one of the government's highest priorities. The defendants' conduct crossed a line from talk to action – specifically, assisting in furthering ISIS's violent methodology of enforcing their ideology. ISIS pursue violence at its core and any money directed to ISIS fuels that violence.

43

The Court is well aware that narcotics trafficking and firearms have plagued the Northern District of Illinois for years and continues to do so to this very day. Here, defendant's actions and the fentanyl that he intended to distribute, as well as the marijuana and methamphetamines that he possessed and intended to distribute coupled with all of the firearms that he possessed at the time of his arrest, would have only served to further exacerbate this epidemic. It is the government's position that a sentence of 360 months' imprisonment will send an appropriate message that individuals who choose to engage in the range of crime that this defendant did, will be appropriately punished.

## V.  SUPERVISED RELEASE

The government requests that the Court impose a term of five-years of supervised release. The government further requests that defendant be required to comply with the conditions of supervised release set forth on pages 52-57 of the PSR.

## VI.  CONCLUSION

The government respectfully requests a below Guidelines term of 360 months' and a five-year term of supervised release that includes the conditions specified on pages 52-57 of the PSR.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:  /s/*Shawn McCarthy*
SHAWN D. McCARTHY
Assistant U.S. Attorney
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604

44