**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CR 858 |
| | ) | Judge Mary M. Rowland |
| JASON BROWN, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S CLARIFICATIONS TO PRESENTENCE
INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

Defendant, **JASON BROWN,** by and through his attorneys, **THOMAS ANTHONY DURKIN** and **JOSHUA G. HERMAN**, and pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure and 18 U.S.C. §3553(a), respectfully submits his Clarifications to the Presentence Investigation Report and his Sentencing Memorandum.

Mr. Brown accepts that he will be punished for his decisions from years ago, and he only hopes that the Court imposes a measured sentence that will allow him to return to his family and be the husband and father that his wife and children deserve. While the offenses to which he plead guilty are no doubt serious, they do not match the hyperbolic notoriety almost five years ago Mr. Brown was arrested on November 14, 2019, with much fanfare via DOJ press releases and media reports proclaiming that the Islamic State had come ashore domestically and had infiltrated and radicalized gangs in suburban Chicago.[1] This climate of fear only amplified when the government

---

[1] *See* Omar Jimenez*, The Department of Justice says a Chicago gang leader was radicalized by ISIS*, CNN.com, Nov. 22, 2019 (available at: https://tinyurl.com/mr42449s) (last visited Sept. 28, 2024); DOJ Press Release, *Suburban Chicago Man Charged with Attempting to Provide Material Support to ISIS*, DOJ Office of Public Affairs, Nov. 15, 2019 (available at: https://tinyurl.com/dfns8246) (last visited Sept. 28, 2024).

added narcotics and firearm charges to the pending material support charges in a superseding indictment.[2] Matching predictions,[3] the War on Terror and the War on Drugs visibly coalesced to create the ultimate political boogey-man: the terrorist gangbanger. The "terrorism expert" cottage industry lapped it up, with one such "expert" writing, "This is the first time, I'm aware, that a group has done this on behalf of ISIS in the United States."[4]

But these doomsday fears of gang members doing *anything* on behalf of ISIS never came to fruition. No material support charges were brought against any other individual, much less the "AHK City" gang. Moreover, as the facts of this case rose to the surface, the promised link between the narcotics and terrorism charges failed to materialize. The War on Terror had not, in fact at least here, merged with the War on Drugs. Now, five years after his arrest, Mr. Brown stands to be sentenced for his actual and rather mundane offense conduct, not the over-the-top allegations trumpeted in the press.

More important, Mr. Brown stands to be sentenced for the person he is, which, until this point, has never been fully presented to the Court. Standing in stark contrast to the boogey-man caricatured in the press, Mr. Brown, notwithstanding his background, is a husband and father of five children, one of whom has never seen him outside of the MCC. He has spent nearly five years in pretrial detention for this offense—longer than he has ever served for any prior sentence—and

---

[2] *See* CBS News, *Suspected Gang Leader Jason Brown, Already Accused of Supporting ISIS, Now Faces Additional Drug, Gun Charges*, CBSNews.com, Mar. 4, 2021 (available at: https://tinyurl.com/b6e5z329) (last visited Sept. 28, 2024); DOJ Press Release, *Federal Gun and Drug Charges Added to Indictment Accusing Suburban Chicago Man of Attempting to Support ISIS*, Mar. 4, 2021 (available at: https://tinyurl.com/342ebcxb) (last visited Sept. 28, 2024).

[3] *See* Thomas Anthony Durkin, *Permanent States of Exception: A Two-Tiered System of Criminal Justice Courtesy of the Double Government Wars on Crime, Drugs & Terror*, 50 Val. U. L. Rev. 419 (2016).

[4] *Supra* note 2, CBS.com report, with quote attributed to Tom Mockaitis.

which includes surviving the extra-punitive conditions imposed during the COVID pandemic. He has also accepted responsibility and fully appreciates the seriousness of the offense conduct as evidenced by his plea agreement and the way he has devoted himself to forging a positive future. He is deeply ashamed of his conduct that has separated him from his family and will keep him apart for yet years still. He only prays for a sentence that will not unduly delay his reunification.

## I.    <u>CLARIFICATIONS TO THE PSR</u>

While Mr. Brown presents no technical objections to the PSR that will ultimately result in a formal change to the advisory guideline range, several clarifications are offered for the Court's consideration.

### A.  PART A. THE OFFENSE
<u>Charge(s) and Convictions(s); Pages 5-6, ¶11</u>

The PSR lists "incidents" that occurred during Mr. Brown's detention at the MCC at pages 5-6, ¶11. For the sake of clarification, three of those incidents relate to the misuse of phones and wearing masks, which resulted in various sanctions. These incidents occurred on March 16, 2020; May 19, 2020; and, May 29, 2020, all during the COVID pandemic. During that time, the MCC placed severe restrictions on detainees' phone privileges. The phone "incidents" related to Mr. Brown using the jail phone in an unapproved manner to communicate with his family during the early stages of the pandemic, a time particularly rife with great uncertainty and fear. Rather ironically, Mr. Brown was also sanctioned for covering his face not to disguise himself, but to mitigate and protect himself during the pandemic. None of the remaining four minor incidents resulted in any disciplinary sanction. As noted, each involved a "suspended" sanction, which means that no punishment was imposed after Mr. Brown displayed a period of good behavior. Counsel offer these clarifications to ensure that Mr. Brown's disciplinary record in the MCC is not

seen as aggravating, given the context and minor nature of these "incidents" that have been logged during Mr. Brown's five years at the MCC.

### B. PART B. DEFENDANT'S CRIMINAL HISTORY
### Pages 16-35, ¶¶75-121

Mr. Brown has a complicated criminal history computation, which results in the severe category VI designation. In the same breath, counsel recognize that there are three avenues to arrive at that designation making it difficult to contest. The first is the "terrorism enhancement" (U.S.S.G. §3A1.4), which Mr. Brown admitted applied in the plea agreement. (Dkt. #115, p. 20, ¶9(e); PSR, p. 35, ¶121). The second is the career offender adjustment, which Mr. Brown also acknowledged applied in the plea agreement. (Dkt. #115, p. 20, ¶9(d)). However, as noted below, the PSR finds the career offender adjustment to apply based on an alternative and separate theory than what the parties agreed to in the plea agreement. This third route tallies Mr. Brown's criminal history points as reflected in the PSR, which amount to 14 and land in Criminal History VI, even if the terrorism enhancement and the career offender adjustment are discounted. However, as noted below, it is Mr. Brown's position that 2 points should be deducted, resulting in a total of 12 and Criminal History V. In short, counsel and Mr. Brown acknowledge, as they must, that he falls within criminal history category VI yet offer several clarifications to ensure the record is accurate, including to his raw criminal history score.

Moreover, and as set forth in the §3553(a) section below, there are reasons to still see Mr. Brown's criminal history designation as overstated, particularly given the outsized impact played by several cases when Mr. Brown was a "youthful offender," including one case from over 20 years ago that triggers the career offender adjustment. Additionally, while counsel do not contest the technical application of the terrorism enhancement from U.S.S.G. §3A1.4, as discussed below, under §3553(a), the Court is well-within its purview to disregard it based on the particular facts of

this case. Doing so dramatically impacts the advisory guideline range, further illustrating how fickle that range is in a case such as this.

### 1. Mr. Brown's Career Offender Designation

In the plea agreement, the parties agreed that Mr. Brown was a career offender based on the following two cases: (1) second degree murder (Dkt. #115, p. 18, ¶9(c)(viii); Case No. 05C44015101) and (2) manufacture/delivery of cannabis (Dkt. #115, p. 19, ¶(9)(c)(x); Case No. 07CR0994201). *See* Dkt. #115, p. 20, ¶9(d). However, since the filing of the plea agreement, Case No. 07CR0994201 has been expunged. (PSR at p. 29, ¶106). Yet, Probation still finds Mr. Brown to be a career offender based on another case, a 2000 manufacture/delivery of a controlled substance offense. (PSR, p. 23, ¶97, Case No. 01CR0221601; *see also* PSR, pp. 35, ¶120).

As reflected in the PSR, Mr. Brown was arrested on that case when he was just 18 years old after police officers discovered him to be in possession of two tinfoil packets of heroin. (PSR, p. 23, ¶97). A three-year sentence was imposed, and Mr. Brown was paroled on December 5, 2002. (*Id*.). A parole violation landed Mr. Brown back in custody, and he was discharged on October 22, 2004. That date is just barely within 15 years of the commencement of the offense conduct here. But for the parole violation that kept Mr. Brown in custody until October 22, 2004, this 24-year-old case would *not* count toward Mr. Brown's criminal history, and he would *not* be a career offender. As discussed in further detail below, this old and minor case has a dramatic and overstated impact on Mr. Brown's advisory guideline range, and it should thus be discounted under §3553(a), even if it is technically counted.

### 2. Corrections to Criminal History

The PSR assigns Mr. Brown 1 (one) criminal history point for possession of cannabis for Case No. 11CR1346101. (PSR, p. 32, ¶112). Counsel believes this case is now expunged, and that

the PSR should not assign the criminal history point. The PSR also assigns 1 (one) criminal history point for Case No. 10-1-50271801, which is for misdemeanor possession of cannabis. (PSR, p. 31, ¶111). A petition for expungement has been filed for this matter, but as of writing the case has not been expunged, but should be in the future. If both minor marijuana cases were discounted and each assigned zero points, Mr. Brown would have only 12 criminal history points, placing him in Criminal History Category V. Despite the fact that Mr. Brown is Criminal History Category VI for other reasons, counsel would request that the PSR be amended to reflect that 0 points are assigned to the marijuana cases in paragraphs 111 and 112.

## II.     <u>POSITION ON THE ADVISORY SENTENCING GUIDELINE RANGE</u>

The parties entered into a negotiated plea agreement on December 6, 2023. (Dkt. #115). Through that agreement, Mr. Brown pled guilty to attempting to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. §2339(B) (Count One); distribution of a controlled substance in violation of 21 U.S.C. §841(a)(1) (Count Five); and, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §924(c)(1)(A) (Count Nine). He also admitted to the pertinent relevant conduct. The plea agreement reflects the guideline range of 360 months to life imprisonment. (Dkt. #115, p. 20). As noted in the PSR, due to the career offender adjustment, the guideline range is 420 months to life imprisonment due to the operation of U.S.S.G. §4B1.1(c)(2), which directs the court to choose the higher of (a) the mandatory minimum sentence (60 months) added to the minimum and maximum guideline range (360 months) and (b) the table in §4B1.1(c)(3), which calls for a range of 262-327 months. (PSR, p. 51, ¶223).

Due to the 10-year mandatory minimum sentence that Mr. Brown faces pursuant to the plea agreement, the effective statutory sentencing range is, therefore, 120 months to life. For

reasons discussed below, this is truly one of the cases where the guidelines, while a starting point, should most certainly not be the ending point. Various §3553(a) factors support a sentence well-below the advisory guidelines. This is abundantly clear when considering how terrorism enhancement (U.S.S.G. §3A1.4) vastly overstates the seriousness of the material support charges and because Mr. Brown's career offender adjustment is in many ways unfair and misplaced.[5]

For the sake of illustration—and as a segue into the §3553(a) discussion—there are ample grounds for the Court to disregard the terrorism enhancement, which takes a "wrecking ball" to the federal sentencing guidelines. *United States v. Jumaev*, 2018 U.S. Dist. LEXIS 119916, *13, 2018 WL 3490886 (D. Colo., July 18, 2018). Pursuant to that extreme enhancement, 12 offense level points are added as a "victim related adjustment." Scholars who have studied the §3A1.4 enhancement have discredited the underlying assumption that terrorism defendants pose a high risk to recidivate, and thus, should be treated as Criminal History VI defendants. *See* James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 LAW & INEQ. 51 (2010) ("when U.S.S.G. section 3A1.4 was adopted, the number of the anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline").[6]

---

[5] The rather absurd cookbook formulation of this draconian guideline range calculation serves only to reinforce the wisdom of using the §3553(a) factors to arrive at the goal of individualized sentencing.

[6] *See also* Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1549-1550 (2017) ("when the Terrorism Enhancement was promulgated, no statistically sound evidence was used to substantiate that all terrorism defendants were so different as to necessitate such a large increase in the Guidelines range. Similarly, courts of appeals upholding the idea that terrorism defendants 'are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation' have also not cited any evidence to support that opinion."); Symposium, *Convicted Terrorists: Sentencing Considerations and Their Policy Implications*, 8 J. NAT'L SECURITY L. & POL'Y 347, 361 (2016) (noting absence of empirical studies for recidivism in terrorism cases). A recent actual study concluded that "Only 1.6% of terrorist offenders released between 2001 and 2018 recidivated, and none of the crimes which they committed postrelease were clearly politically

The automatic 12-level increase is particularly noxious, especially for a case like this one. For giving $500 on three occasions to an undercover who wanted to send the funds to a cousin posing as an ISIS member in Syria, Mr. Brown receives the same adjustment as a defendant who took actionable steps to blow up a building and kill innocent people or a defendant who decided to travel overseas to join a foreign terrorist group to fight on the battlefield. Automatically imposing a sentence based on the terrorism enhancement fails to make meaningful distinctions between defendants who may merit that enhancement through technical application of the language of statute and guideline, but who could not be farther apart in terms of nature and severity of conduct. This is typical of a guideline that is not backed by any empirical evidence, which is the case for §3A1.4. It is also one of the several reasons why the Court should disregard the terrorism enhancement in its §3553(a) analysis for Mr. Brown.

Second, the Court should also exercise its authority under §3553(a) and disregard the career offender adjustment. The Seventh Circuit has made clear that sentencing courts are "not [bound] by the three-strikes provision of the career-offender Guideline" and are "free to disagree" if they have a categorical policy disagreement as well as a disagreement "in a particular case." *United States v. Connor*, 598 F.3d 411, 415-16 (7th Cir. 2010); *see also United States v. Newhouse*, 919 F. Supp. 2d 955, 967 (N.D. Iowa 2013) (rejecting the career offender guideline on a "quasi-categorical" policy objection based in part on the defendant's individual circumstance). Courts have recognized that the career offender enhancement is severely flawed and have either declined to impose the enhancement or have granted substantial variances from the enhanced guideline range based on policy objections or varying §3553(a) factors. *See*, *e.g.*, *Newhouse*, 919 F. Supp.

---

motivated." *United States v. Ceasar*, 388 F. Supp. 3d 194, 214 (E.D.N.Y. 2019) (citing Hodwitz, Omi, "The Terrorism Recidivism Study (TRS): Examining Recidivism Rates for Post-9/11 Offenders," *Perspectives on Terrorism* 13 (April): 54-64, available at: https://bit.ly/34H0m5A) (last visited Sept. 30, 2024).

2d at 967 ("For the reasons discussed below, I join the growing chorus of federal judges who have rejected applying the Career Offender guideline in certain cases."); *United States v. Whigham*, 754 F. Supp. 2d 239, 247-48 (D. Mass. 2010) (granting downward variance on a number of grounds and noting that "there is also no question that the career offender guidelines are flawed."); *United States v. Patzer*, 548 F. Supp. 2d 612, 617 (N.D. Ill. 2008) (declining to apply the Career Offender guideline where its application overstated the seriousness of the defendant's prior convictions and was in excess of that required for deterrence); *United States v. Fernandez*, 436 F. Supp. 2d 983, 988-90 (E.D. Wisc. 2006) (declining to apply the Career Offender guideline because, based on defendant's specific circumstances, it produced a guideline range "greater than necessary to satisfy the purposes of sentencing.").

As illustrated above, Mr. Brown is a career offender solely because of the minor narcotics case involving two tin-foil packets of heroin that he caught in 2000 when he was just 18 years old. The case resulted in imprisonment within 15 years of the instant offense conduct solely because of a parole violation, and moreover, barely squeaked in the requisite timeframe. Additionally, the career offender adjustment simply based on that old case has a disproportionate and outsized impact on his guidelines, which provides further grounds to disregard its application. The following calculations of the guidelines, absent the terrorism enhancement and the career offender adjustment, illustrate this point starkly.

If the Court were to disregard the terrorism enhancement, the adjusted offense level for Count One would be 28, as the 12-level enhancement from U.S.S.G. §3A1.4 would be ignored. (PSR, p. 13, ¶48, 49). The adjusted offense level for Count Five would remain at 34. (PSR, p. 15, ¶63). The grouping analysis under U.S.S.G. 3D1.4(a), (b), and (c) would be as such:

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Count 1 and<br>Relevant conduct | 28 | .5 |
| Count 5 and<br>Relevant conduct | 34 | 1 |
| Count 9 | 0 | 0 |
| Greater of the Adjusted Offense Levels Above: | | 34 |
| Increase in Offense Level under U.S.S.G. §3D1.4 | | +1 |
| Combined Adjusted Offense Level | | **35** |

After reducing the combined adjusted offense level by (3) points for acceptance of responsibility, the total offense level would be **32**.

Counsel further submits that, for the reasons set forth above, the two marijuana cases in paragraphs 111 and 112 should also be disregarded. Doing so would drop Mr. Brown from Criminal History category VI to V.

When level 32 is combined with category V, the adjusted guideline range is 188-235 months. This alternative analysis has discounted the career offender adjustment, which counsel submit is proper. Not applying that adjustment also obviates the need to resort to U.S.S.G. §4B1.1(c), which is triggered when there is both the career offender adjustment and a §924(c) conviction. Without U.S.S.G. §4B1.1(c) in play, the Court could simply impose the 60-month sentence consecutive to any sentence fashioned for the remaining counts of conviction. In other words, the Court would start with the 188-235 month guideline range, fashion a sentence, and then impose the 60-month consecutive sentence for Count 9.

Counsel respectfully request that the Court exercise its sound discretion under §3553(a) to disregard both the terrorism enhancement and the career offender adjustment and consider the §3553(a) factors with the more appropriate 188- 235 month guideline range in mind.

### III.  SENTENCING MEMORANDUM

#### A.  Legal Standards

As this Court is no doubt aware, the Sentencing Guidelines serve as a "starting point" and "initial benchmark" for determining a just sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Pepper v. United States*, 562 U.S. 476 (2011); *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall*, 552 U.S. at 49); *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011). Under *Gall*, sentencing judges must "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. *Gall*, 552 U.S. at 49. While the advisory guideline range is the starting point for any sentencing analysis, it is fortunately not the end point. The Court, of course, has substantial discretion to vary from the guidelines, including the career offender adjustment.

The Seventh Circuit has emphasized how "the Guidelines are, after all, guidelines [that] must be considered seriously and applied carefully…. In the end, however, the defendant's sentence is the responsibility of the district judge, after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a)." *United States v. Lopez*, 634 F.3d 948, 953-954 (7th Cir. 2011) (cleaned up). Adequate consideration of the §3553(a) sentencing factors helps ensure that the sentencing decision is individualized, as it must be. *See Concepcion v. United States*, 142 S. Ct. 2389, 2399 (2022) (cleaned up) ("Indeed, it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

Individualized consideration necessarily requires the Court to impose a sentence that is "sufficient but not greater than necessary"—a standard also known as the "parsimony" clause that

is the "overarching provision" of §3553(a). *Kimbrough*, 552 U.S. at 101. By its very terms, that provision instructs the Court to consider a sentence that is the least severe, *i.e.*, not greater than necessary. *See United States v. Santoya*, 493 F. Supp. 2d 1075, 1077 (E.D. Wis. 2007) ("This is the so-called 'parsimony provision,' which requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public and rehabilitation of the defendant.").

### B.  Nature and Circumstances of the Offense Conduct—§ 3553(a)(1)

In determining the sentence to be imposed, the Court must consider the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). While it must be reiterated that there is no real connection between the material support offense, on the one hand, and the narcotics and firearm offenses, on the other, Mr. Brown acknowledge the seriousness of the offense conduct even if the different crimes are unrelated. The plea agreement sets forth a detailed, eight-page factual basis that comprehensively describes the offense conduct. (Dkt. #115, pp. 3-11). Likewise, the PSR summarizes the offense conduct in great detail. (PSR, pp. 4-12; ¶¶ 1-40).

As with many domestic national security cases, the precise origins of the investigation into Mr. Brown are opaque; and in this case perhaps for very good reasons known only to the national security surveillance authorities. However, it does appear as far as counsel can tell that Mr. Brown was on law enforcement's radar by the time he was in custody for the Georgia firearms offense in 2016. His communications seem to have been monitored while serving that two-year sentence and then following his release in June 2018. Those communications included Mr. Brown communicating in early 2017 with a man named Trevor William Forrest, AKA Shaikh Abdullah Faisal. Later in August 2017, a New York state grand jury indictment was unsealed, charging

Faisal with terrorism-related charges under New York State law.[7] Then in December 2017, the United States Department of the Treasury's Office of Foreign Assets Control (OFAC) named Faisal a Specially Designated Global Terrorist based on Faisal's provision of support to ISIS, pursuant to Executive Order 13224. Among other things, Faisal released religious speeches that were publicly available for download and viewing, which Mr. Brown did as the government monitored him. However, as the lead case agent himself charitably acknowledges, viewing and sharing this material is squarely protected by the First Amendment. (PSR, p. 7, ¶18).

After Brown's release from the Georgia state prison in June 2018, he was subjected to intense and extraordinary physical and electronic surveillance, including installing pole cameras outside of his house; being tracked by federal agents including through aerial surveillance; having his phones monitored; having his trash examined; and being targeted by other forms of court-ordered surveillance methods and techniques. As reported in discovery materials, on at least on one occasion Mr. Brown and his wife confronted law enforcement officers who were tailing them in a not-so-covert vehicle.

In addition to this wraparound surveillance and monitoring, law enforcement injected into Mr. Brown's life confidential sources and informants who were paid tens of thousands of dollars for their services targeting Mr. Brown. One confidential source, who is called "CS-3," struck up a false friendship with Mr. Brown after infiltrating the mosque he attended by no later than January 2019.[8] CS-3 also had a business connection with Mr. Brown, as they both worked in the car-sales business. They often ate together and discussed their families. Mr. Brown would even bring his

---

[7] Faisal was convicted in New York State court in March 2023, and later sentenced to a term of 18 years' imprisonment.

[8] CS-3 was financially motivated to help make a case against Mr. Brown. Reports indicate that CS-3 was paid at least $29,000 for his role as Mr. Brown's false friend.

children to some of these meals. CS-3 played upon Mr. Brown's religious devotion, as their discussions frequently delved into interpretations of the Koran and what it meant to be a proper Muslim. This was important to Mr. Brown, a convert to the religion who in many ways was still learning its edicts and expectations. CS-3 claimed to have family in the Middle East and professed a deeper understanding of Islam than the relatively, newly acquainted Mr. Brown.[9]

Eventually, Mr. Brown asked CS-3 if he could help him acquire women's clothing from the Middle East. Mr. Brown did this because he was interested in starting a legitimate business that sold traditional Islamic clothing. These discussions occurred as early as February 8, 2019, as reflected in law enforcement reports. Seeking to create and exploit an angle, CS-3 used Mr. Brown's legitimate interest in buying traditional Islamic clothing to introduce his fake Syrian cousin, an undercover called "Abu Jaffar." Abu Jaffar would later pose as an ISIS fighter and the recipient of the money that Mr. Brown would be lured into giving to CS-3. However, CS-3 did not introduce Abu Jaffar to be an ISIS fighter.

A summary of Mr. Brown's February 8, 2019, meeting with CS-3 includes the following statement: "Brown tells CHS he has a business plan he wants to implement with respect to Islamic clothing and asks CHS if CHS knows of anyone. CHS tells Brown that CHS has a cousin who sells robes and clothes in Syria. Brown then goes on to discuss his business and pricing strategy." (DECLASS_001-000216). Women's clothing, not terrorism, was the consistent theme in Mr. Brown's conversations with CS-3. After he met CS-3 on February 22, 2019, the FBI generated

---

[9] It should go almost without saying that that the extent, pervasiveness, and very length of time the government spent surveilling Mr. Brown undermines any claim of his dangerousness. Further, while Mr. Brown has admitted to the possession of other narcotics and firearms found after his arrest on November 14, 2019. Despite the constant surveillance, Mr. Brown was never seen carrying any weapons in public or engaged in transactions involving those narcotics. Again, Mr. Brown fully accepts responsibility for possession of those narcotics and firearms and these points are only made to counter any suggestion that he was a gun-toting drug kingpin.

another report that reiterated this point: "Brown brought up importing women's Islamic clothing. Brown inquired if CHS's cousin in Syria could accommodate that request. CHS stated his/her cousin was a hard person to get hold of, but would ask. CHS told Brown that he would be supporting a good cause. Brown shook his head up and down, smiling." (DECLASS_003-000028).

CS-3 and Abu Jaffar would go so far as to message each other to create a paper-trail ruse. The two devised a backstory with these text messages, presumably to show Mr. Brown if he questioned whether CS-3 and Abu Jaffer were really cousins. Tellingly, even this fake backstory reflected Mr. Brown's true desire to obtain Islamic women's clothing. For example, on March 1, 2019, CHS-3 wrote the following message to Abu Jaffar:

> CHS: Peace be upon you, my dear [Redacted]. I have a friend here who is trying to purchase women's clothing; 'Abayas and Islamic attire. Do you have any idea how we can get them here? Check on this for me – may Allah bless you – so I can let him know; meaning as a business. He's trying to open a route to here.

(DECLASS_002-000168). As more proof of Mr. Brown's true intent to obtain traditional Islamic women's clothing, in early April 2019, CS-3 gave Mr. Brown 9 (nine) traditional Islamic robes. The FBI report notes that Mr. Brown said, "they were exactly what he was looking for and was very excited, taking pictures of the robes." (DECLASS_003-000061). Brown asked CS-3 how he should pay Abu Jaffer for the robes. (DECLASS_003-000086). To further lure Mr. Brown and gain his trust and favor, CS-3 told Mr. Brown that Abu Jaffer gave him the robes as a gesture of good will, and that he did not have to pay for this first shipment of clothing. In hindsight, this calculated move was designed to not only curry Mr. Brown's favor toward Abu Jaffer, but more specifically, to make Mr. Brown feel like he owed Abu Jaffer by literally putting him in his debt after the latter sent nine authentic Islamic robes at no cost.

During one meeting over  a meal on August 14, 2019, CS-3 continued to talk about how his cousin was in material need in Syria. He even told Mr. Brown that he, himself was preparing

to send money to his cousin, sharing, "I'm working on something for him, if you wanna….you said last time….let me know." According to CS-3, Abu Jaffar, posing as the ISIS fighter, needed the money for clothing and gear. CS-3 said that he had "sent some earlier." (DECLASS_003-000129). Mr. Brown expressed a willingness to pitch in with his own money.

On August 16, 2019, two days later, Mr. Brown and CS-3 shared another meal together. Before departing, CS-3 told Mr. Brown, "I'm gonna go now and send him money…. I'm gonna send him some today." (DECLASS_003-000136). Mr. Brown then gave CS-3 $500 to send to his "cousin" along with his own money. (DECLASS_003-000136). Mr. Brown gave CS-3 another $500 on September 6, 2019, after CS-3 showed Mr. Brown a fake photo depicting the cousin under an ISIS flag with the clothing and gear that the prior funds supposedly helped purchase.

The third and final $500 was given on October 4, 2019, more than a month before Mr. Brown would be arrested. During this entire time Mr. Brown and CS-3 continued doing business with cars. There is no suggestion that Mr. Brown asked CS-3 for further opportunities to donate money to Abu Jaffer or provide other forms of assistance. Nor is there evidence that Mr. Brown even insisted that others give money to CS-3. While Mr. Brown has admitted to the offense conduct, the arc of his relationship with CS-3 and CS-3's own conduct provides the essential context to more accurately measure the nature and circumstances of the offense. This is simply not a case where Mr. Brown actively sought out opportunities to give money to ISIS out of the box. Rather, it was CS-3 who approached Mr. Brown on the subject, and only after, in a very calculated manner, establishing a personal relationship through the car business and Mr. Brown's desire to start an Islamic clothing business. In many ways, elements of imperfect or soft entrapment, while not a total defense to the offense conduct, most certainly mitigate its seriousness.[10]

---

[10] The doctrine of "imperfect entrapment" is a legitimate basis for a sentencing variance. *See United States v. Bala*, 236 F.3d 87 (2nd Cir. 2000); *United States v. Giles*, 768 F. Supp. 101, 103-04 (S.D.N.Y.), aff'd

Moreover, without minimizing this offense conduct, or the seriousness of terrorism in general,[11] respectfully, this is the low-hanging fruit of a material support charge. It also undercuts any suggestion that Mr. Brown served as some type of recruiter through his association with others in the purported "AHK" gang. There is absolutely no evidence that Mr. Brown attempted to convert or radicalize any other individual to Islam for the purpose of joining ISIS or committing violence domestically.

### C.  History and Characteristics of Defendant—§3553(a)(1)

In determining the sentence to be imposed, the Court must also consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

### 1.  Mr. Brown Grew Up Under Extremely Difficult and Tragic Circumstances That Shaped the Man He Became.

Mr. Brown was born in Chicago in 1982. (PSR, p. 43, ¶170). He did not meet his father until he was 12 years old and has never had a relationship with him. (PSR, p. 43, ¶170). Mr.

---

without op., 953 F.2d 636 (2d Cir. 1991); *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1999); *United States v. McClelland*, 72 F.3d 717, 726 (9th Cir. 1995) (affirming downward departure based on imperfect entrapment, discussing scope of imperfect entrapment defense, in that it can apply when the defendant first proposes the offense (for if it did not, and the defendant was not predisposed, then it would be grounds for acquittal); *United States v. Taylor*, 696 F.3d 628, 633-34 (6th Cir. 2012) (recognizing the doctrine of "imperfect entrapment," "the notion that undue government encouragement to commit an offense can mitigate punishment even if it cannot wholly defeat criminal liability," but affirming sentence finding that court considered arguments even though it did not mention imperfect entrapment directly); *United States v. Osborne*, 935 F.2d 32, 35 n.3 (4th Cir. 1991); *United States v. Way*, 103 F. App'x 716, 718 (4th Cir. 2004) (recognizing that district court has authority to consider imperfect entrapment argument and affirming court's decision to reject the theory); *See United States v. Díaz-Maldonado*, 727 F.3d 130, 140-41 (1st Cir. 2013) ("Díaz asserts that by not considering the issue of "imperfect entrapment," the district court did not give proper heed to the section 3553 factors. "Imperfect entrapment" has sometimes been used by other courts as the basis for a downward departure at sentencing when a defendant demonstrated that he was 'pressured unduly by the government to go forward with [an] offense . . . .' *United States v. McClelland*, 72 F.3d 717, 725 (9th Cir. 1995). Where, as here, a defendant seeks a downward variance on that basis, the claim of imperfect entrapment can be thought of as fairly encompassed in the analysis of the 'nature and circumstances of the offense' under § 3553(a).").

[11] When discussing "terrorism," one must be careful to always remember the adage that "one man's terrorist is another man's freedom fighter." It does not take too much discernment of the history of the specially designated or foreign terrorist organization classifications to appreciate the wisdom inherent in the adage.

Brown's father's whereabouts are unknown. (*Id.*). His mother confirms that Mr. Brown never had a father figure or male role model and recalls how even her husband, the stepfather whom Mr. Brown recalls was a "hustler" who "sold drugs and had 'women,'" offered no support for Mr. Brown. (PSR, p. 45, ¶181).

Mr. Brown's youth was marred by severe and at times destructive instability. His mother cycled through several marriages, abandoned by husbands who wanted to be in the streets and who destroyed their relationships through drug usage. (PSR, p. 44, ¶¶172-73). He was raised primarily by his mother, who had little support herself and dealt with physical abuse. (PSR, p. 44, ¶174-175). Due to his mother's late work schedule, he was often left in the care of his half-sister who watched him at home. (PSR, p. 44, ¶175). However, that did not last long after his half-sister began using crack cocaine and heroin. (*Id.*). At some point, Mr. Brown's maternal grandmother moved in, but Mr. Brown avoided her because "she smelled of alcohol." (*Id.*).

Mr. Brown's environment became even more precarious when the family moved from Chicago to Bellwood in 1988, when Mr. Brown was just six years old. (PSR, p. 44, ¶177). Mr. Brown's half-sister did not join them because she was, as Mr. Brown recalls, "heavy in the streets." (*Id.*). Mr. Brown also recalls that while he was provided shelter, he only had minimal food and clothing due to his family's difficult financial situation. (PSR, p. 44, ¶177). As noted above, Mr. Brown's stepfather was no father at all to Mr. Brown. Instead of being supportive, Mr. Brown's stepfather was abusive toward his mother. (PSR, p. 45, ¶181). Mr. Brown witnessed these physical and verbal altercations, which his mother confirms. (*Id.*).

Just a few years later, Mr. Brown experienced a trauma that no one, especially a child, should have to endure. (PSR, p. 45, ¶179). Rather than restate those details in this public pleading, counsel will instead rely on the information conveyed in the PSR. (PSR, p. 45, ¶179). Mr. Brown

remembers receiving some counseling after this trauma, but does not recall specifics, signaling that the services were meager and minimal, at best. (PSR, p. 47, ¶194). Coupled with a prior reported suicide attempted, albeit years ago (PSR, p. 47, ¶193), ordering a mental health evaluation and, if necessary, counseling while on supervised release, would be proper to address underlying psychological issues that have no doubt festered for years.

Given this environment, not surprisingly, Mr. Brown soon began abusing alcohol at an early age of 13, progressing to excessive drinking by the time he was 17. (PSR, p. 48, ¶198). He also began using marijuana daily, starting when he was just in 6th grade. (*Id.*). He participated in the first of several court-ordered substance abuse program when he was only 15, which had little impact as his smoking and drinking continued. (PSR, p. 48, ¶201, 202). No doubt, this substance abuse led to Mr. Brown keeping bad company (PSR, p. 48, ¶203), making poor decisions, and encountering law enforcement on a regular basis as a youth. This tumult, also not surprisingly, led to Mr. Brown dropping out of high school in Maywood. (PSR, p. 49, ¶209).

Thus, instability, the lack of a father-figure or other positive male role model, domestic abuse, physical abuse, and substance abuse were the norms for Mr. Brown growing up. This is so even though he had and continues to maintain a positive relationship with his mother, who truly tried her best. (PSR, p. 44, ¶175). Yet, from her perspective, Mr. Brown's mother feels that there is more she could have done. In her letter she writes: "I raised my son on my own as a single mother. I tried my best to give him a good upbringing but I have fell short in some respects." (Cathy Miller Letter). Regardless of if more could have been done, it is this tumultuous upbringing that forged Mr. Brown

### 2. Mr. Brown's Love for His Family, And His Recognition of How He Failed Them.

Notwithstanding this difficult childhood, the letters submitted by Mr. Brown's loved ones notably describe him as an "amazing father" who is dedicated to his children. (Hue Phong Letter). Three of his children have written letters of their own in which they share how their father spent time with them and taught them important lessons. (M.A. Letter; N.A. Letter; A.A. Letter). Every letter speaks plainly about the void that Mr. Brown's detention has left in the family's life. While the view of Mr. Brown as an "amazing father" may very well be true from the perspectives of his family members, Mr. Brown himself knows that he has not lived up to that description. He knows that he is responsible for not being present in their lives. He realizes that he is at fault for the sadness reflected in his children's letters as they share fond memories of how he took them to the park, played basketball, watched movies, ate together, and shared other everyday experiences that have been missing for the past five years. It pains him to no end to know that he is to blame for not being able to share those moments with his youngest child who was born after his arrest. Knowing that his conduct is the cause of the hurt his loved ones have suffered is a punishment that Mr. Brown endures daily.

Still, Mr. Brown maintains strong bonds with his family and remains determined to do what he can to support his family, even from a distance and while in custody. Even with the challenges of his detention, Mr. Brown speaks with his mother and half-sister at least once or twice weekly. (PSR, p. 44, ¶176). Mr. Brown's entire family remains supportive and hopeful for his return. (*Id.*). These strong ties are clearly seen in his lasting relationship with his wife, Hue Phong, who he married in 2007. (PSR, p. 45, ¶181). They now have five children together, with their youngest just three years old. The three-year-old was the child born while Mr. Brown was detained

at the MCC. (PSR, p. 46, ¶184). Hue has been constant in her support of her husband during his detention. (PSR, p. 45, ¶183).

The case, Mr. Brown's detention, and the uncertainty his future holds—particularly the length of his incarceration—have placed incredible strain on the family. Hue has borne this consuming strain on her shoulders, which has come at a cost to her health. (PSR, p. 45, ¶183). Prior to Mr. Brown's arrest, Hue focused on raising the children and homemaking. Now, she works as a school bus driver and relies on government financial assistance. (PSR, p. 45, ¶182). Mr. Brown realizes that his family would have fallen apart if not for Hue's strength and steady hand, and for that, he is forever grateful. He is also deeply ashamed that his behavior has been the cause of her hardship.

### 3. How Mr. Brown's Early Encounters with Law Enforcement Impacted His Criminal History and His Life Trajectory

With little guidance at home, no male role model, and exposure to and use of narcotics and alcohol, Mr. Brown was very susceptible to the draw of life on the streets. This led to regular encounters with the Bellwood police department. The PSR remarkably reflects over 30 arrests and adjudications before Mr. Brown 18 years old. Of note, are the numerous arrests for loitering and cannabis possession starting when Mr. Brown was just 15 years old. (*E.g.*, PSR, pp. 19-20, ¶¶87, 88, 89, 90; 35-36, ¶¶126, 129, 130, 131, 132). The "loitering" and "unlawful assembly" arrests may have been akin to the youth street-sweeping tactics that were popular at the time and found unconstitutional in *City of Chicago v. Morales*, 527 U.S. 41 (1999). Regardless, these frequent negative encounters with law enforcement placed Mr. Brown on a carousel of arrests for minor offenses that further disrupted his already precarious circumstances as a youth. He cycled in and out of juvenile detention facilities, which, if anything, resulted in just the opposite of rehabilitation.

With little family support and no solid social structure, the young Mr. Brown had no real way to escape the negative influences of the environment that shaped him. As noted above, at 18 he was arrested for dealing narcotics and sentenced to three years in prison. That case and its imprisonment casts a figurative and literal shadow over Mr. Brown's life. Not only did it mark his first prison sentence,[12] but due to a parole violation, that offense from over 20 years ago also adds three points to his criminal history and renders him a career offender. While counsel do not challenge the technical application of that old case to the Guidelines, it is worth noting that much of Mr. Brown's criminal history occurred when he was a youth, and there have been significant developments that mitigate offenses committed by juveniles and young adult offenders.

Indeed, courts at all levels up to and including the Supreme Court itself, as well as the Sentencing Commission have found merit in challenges to punishments imposed on young offenders. Well known cases such as *Miller v. Alabama*, 567 U.S. 460 (2012), *Roper v. Simmons,* 543 U.S. 551 (2005)*, Graham v. Florida*, 560 U.S. 48 (2010), and *Montgomery v. Louisiana,* 577 U.S. 190 (2016) lead the way in explaining how young offenders are qualitatively different due to their developing brains, evolving executive brain function, and experiencing trauma without the ability to extricate themselves from their circumstances. Those and other factors have led courts to find that young offenders are often less deserving of severe punishments.

The Sentencing Commission has embraced these principles and, effective November 1, 2024, the language of U.S.S.G. §5H1.1 will be amended to provide that age "may be relevant in determining whether a departure is warranted." The Sentencing Commission explains that this amendment "adds language specifically providing that a downward departure may be warranted

---

[12] Mr. Brown received concurrent sentences for two other narcotics cases when he was sentenced in June 2001. *See* PSR, p. 22-24, ¶¶96, 98.

in cases in which the defendant was youthful at the time of the instant offense or any prior offenses."[13] Thus, and at a minimum, the Court should consider these principles, including the forthcoming amendment to §5H1.1, which applies to "prior offenses," when weighing Mr. Brown's criminal history.[14]

---

[13] *See* U.S. Sentencing Commission, 2024 Amendments in Brief (available at: https://tinyurl.com/yfahakew) (last visited Sept. 29, 2024). The Policy Statement in §5H1.1 will be amended to include the following language:

> Age may be relevant in determining whether a departure is warranted.

> Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful

> individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

> The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

(available at: https://tinyurl.com/38rxmcwr) (last visited Sept. 29, 2024).

[14] In addition to the 2000 narcotics offense that triggers the career offender designation, Mr. Brown also receives 3 (three) criminal history points for a second-degree murder conviction from 2005 when he was 22 years old, which is still squarely within the young-adult offender range. (PSR, p. 27, ¶104). While this offense is no doubt serious in its own right, counsel must highlight that the sentence calls into question exactly how serious it was or the strength of the State's evidence. The PSR notes that Mr. Brown received a 4-year sentence and was credited 352 days of time-served, which effectively made this a time-served sentence when sentencing credits are factored. The PSR also reflects that more serious charges of first-degree murder were dismissed by the State. Based on the short narrative in the PSR, it appears that Mr. Brown had defenses to the charge, including self-defense, which likely led to the significantly reduced charge.

### 4.  **Mr. Brown Endured the Entire COVID Pandemic at the MCC.**

Relevant to Mr. Brown's history and characteristics is the fact that he has been held in pretrial detention since his arrest on November 14, 2019, for close to five years now. This detention spanned the entire COVID pandemic at the MCC. Now, it is relatively easy to minimize or even forget the extreme conditions and constant dread that detainees like Mr. Brown faced daily. Yet, Mr. Brown cannot forget the chaos and fear that took over. When news of the global pandemic broke in March 2020, and in the months that followed, it was unclear whether becoming infected with the COVID-19 virus would be a death sentence. While people in the community could take protective measures such as social distancing, masking, and hand sanitizer, those like Mr. Brown behind bars could not. To the contrary, the cramped conditions, lack of ventilation, and general absence of mitigating measures made jails like the MCC hotbeds for viral outbreaks. That is what happened on multiple occasions at the MCC, and Mr. Brown, himself, was infected with the virus.

Mr. Brown was also forced to endure the BOP's draconian response to the pandemic: long periods of isolation; the lack of social visits; the suspension of programming; and extended lockdowns. The Court will no doubt recall compassionate release motions filed by desperate inmates during the height of the pandemic, in other words, when detainees rightfully complained of conditions that put their lives at risk and had profound negative impacts on their mental health. These motions often cited the BOP's own data that listed thousands of infected inmates and tracked the rising death toll. Those were the horrific conditions Mr. Brown lived through.

In short, the time that Mr. Brown has served has been "harder" time compared to those detained, both before and after, the pandemic. This factor should be considered not only in terms of his history and characteristics, but also when considering what is "just punishment." *See*, *e.g.*,

*United States v. Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003) (conditions of confinement, including 23-hour-a-day lockdowns with no outside access permitted a downward departure); *accord United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.").

### 5. Mr. Brown's Plans for the Future to Improve Himself and Support His Family in the Process.

Mr. Brown, notwithstanding his upbringing and lack of formal education, is a very intelligent and self-aware individual and in counsels' opinion has the ability to turn his life around. He has shown resilience to overcome obstacles and challenges that have stood in his way since childhood. For instance, Mr. Brown obtained his GED despite his sporadic attendance, behavioral and disciplinary challenges, and needs for special education that he experienced in the school system. (PSR, p. 49, ¶¶207-210). Likewise, Mr. Brown was able to wrestle himself out of the depths of his long history of substance abuse. He explained to Probation how he recognized that he needed to address his substance abuse issues because he hated how he smelled like marijuana and alcohol when he dropped his kids off at Islamic school. (PSR, p. 48, ¶203). This realization played a large role in Mr. Brown's abstinence from drugs and alcohol, as reflected in the negative drug test on November 14, 2019, provided after his arrest in this case. (PSR, p. 48, ¶204). It is also quite obvious that his conversion to Islam is sincere and genuinely plays a large roll in his life at this point.

In a similar vein, since his detention, Mr. Brown has dedicated himself to self-improvement, availing himself to multiple programs at the MCC. These pro-social programs were largely unavailable while Mr. Brown and other detainees endured the hardest of times during the

height of the COVID pandemic. Since then, Mr. Brown eagerly enrolled in numerous programs after they became available. Attached hereto as Exhibit B are the following certificates that Mr. Brown has obtained through his hard work: Self-Awareness Program (8/14/24); Centering Prayer (7/30/24); Parenting Program Phase 1 (4/25/24); How to Market Yourself (6/27/22); General Job Search for the Returning Citizen (6/27/22); Interview Process (10/21/22); World Governments (8/16/22); Business Plan (4/12/22); Where to Locate Job Openings (4/12/22); Manage Credit Wisely (4/12/22); Health Benefits of Strength Training (6/28/24); Hypertension (1/16/24); Arthritis Foundation Walk with Ease (3/4/24); Diabetes Type II, Living with Chronic Conditions (7/24/24). (*See also* PSR, p. 49, ¶213 (corroborating educational programs in BOP)).

Many of these programs reflect Mr. Brown's forward-thinking attitude and his efforts to equip himself with the tools and skills needed to join the workforce upon his release from prison. Mr. Brown fully intends on continuing this self-improvement path while he serves the remainder of his sentence and after he is released. He has explored vocational training programs that the BOP makes available and has also expressed interest in obtaining a commercial driver's license. (PSR, p. 49, ¶212). Additionally, Mr. Brown does have trade-related training through an electrical program at Coyne College. (PSR, p. 49, ¶211). Mr. Brown knows full well how difficult it is for felons to secure employment upon release from prison. He previously experienced those challenges and was, admittedly, not prepared for what awaited him when he was last released from custody, which led to his regrettable decisions that have led him to this sad point. Learning from that experience and determined not to repeat his prior mistakes, he is driven to be fully prepared to support his family through gainful employment upon his release.

### D. A Sentence Well Below the Advisory Guidelines
### Addresses the Factors Set Forth in § 3553(a)(2)

In fashioning its sentence, the Court also takes into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence (general deterrence) and protect the public from further crimes of defendant (specific deterrence); and to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

Starting with the issue of deterrence, general deterrence "is premised on an assumption that imposing an appropriate sentence will dissuade others from committing similar crimes," while specific deterrence focuses on "the prevention of future harm to the public by the defendant, without reference to the mechanism for achieving it." *United States v. Henshaw*, No. 16-cr-30049-SMY, 2018 U.S. Dist. LEXIS 111052, at *19-21 (S.D. Ill. July 3, 2018).

As to general deterrence, counsel recognizes the importance of general deterrence as a concept. But whether any sentence imposed on Mr. Brown will deter others from engaging in similar conduct is open to question. That is especially so because the deterrence question should be tailored to deterring others who are similarly situated and not some abstract aspirational concept.

The Court is no doubt familiar with the criticisms about the assumptions that are often made about general deterrence. Scholarship and studies have found that the certainty of punishment rather than the severity of punishment has a greater impact on deterrence. *See*, *e.g.*, Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, p. 1, The Sentencing Project, Nov. 2010; *United States v. Courtney*, 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M. 2014) (citing studies). ("An avalanche of criminological studies have

determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world."); National Institute of Justice, *Five Things About Deterrence* ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.") (available at: https://bit.ly/3Sgcstw) (last visited Sept. 17, 2024). At a minimum, there are serious questions over whether there is any causation or correlation between a sentence imposed, including an increase in prison time, and a corresponding reduction in crime going forward. *See* Professor Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence,* 100 J. CRIM. L. & CRIMINOLOGY 765 (2010) (available at: https://tinyurl.com/2jjvzsz2) (last visited Sept. 30, 2024) ("In spite of its central importance, and the very high expectation we have that legal punishment and criminal justice policies can inhibit crime, we do not have very solid and credible empirical evidence that deterrence through the imposition of criminal sanctions works very well. While we have an abundance of research about specific police, judicial, and correctional policies, as well as more general theoretical work about deterrence mechanisms, the evidence to date, while suggesting that there is a deterrence return to all that we do about crime, is more than a little flimsy.").

Setting aside the debate between certainty versus severity, it is often difficult, if not impossible, to measure how much deterrence will result from a particular sentence. With that said, counsel submits that if there is a message to be sent, it can be fashioned through a sentence that is well below the guidelines for Mr. Brown. Even a sentence closer to the mandatory minimum is a heavy price to pay that sends a stern message to others who are contemplating similar offense conduct, which also addresses concerns for just punishment and promoting respect for the law.

Turning to specific deterrence, counsel recognize this to be a concern, even without the misplaced terrorism enhancement and the weak career offender adjustment. Indeed, as the

government will no doubt highlight, Mr. Brown was on probation for the Georgia firearms case when the offense conduct in this case began, particularly related to the marijuana-related activity. Mr. Brown offers no excuses for his regression after being released on the Georgia case. However, counsel submit that the specific deterrence analysis should be forward-looking and factor in Mr. Brown's conduct in the MCC for the past five years, which has more recently been marked by positive, pro-social programming. Mr. Brown has everything to live for and has now seen how his choices have hurt and harmed his family, in addition to posing risks to the community. These factors weigh heavily against recidivism concerns.

Additionally, even a sentence closer to the ten-year mandatory minimum will keep Mr. Brown in custody until, at least, his late 40s, which further addresses specific deterrence concerns, particularly given the narcotics-related offenses at issue in this case. Indeed, in *United States v. Presley*, 790 F.3d 699, 702 (7th Cir. 2015) the Seventh Circuit specifically noted that criminals "engaged in dangerous activities such as heroin dealing, tend to have what economists call a 'high discount rate'—that is, they weight [sic] future consequences less heavily than a normal, sensible, law-abiding person would." *Id*. at 701. The Seventh Circuit also observed as follows:

> The sentencing judge in this case did not refer to any of this literature, and in any event gave no reason to think that imposing a 37-year sentence on Presley would have a greater deterrent effect on current or prospective heroin dealers than a 20-year or perhaps even a 10-year sentence, or that incapacitating him into his sixties is necessary to prevent his resuming his criminal activities at that advanced age. Sentencing judges need to consider the phenomenon of aging out of risky occupations. Violent crime, which can include trafficking in heroin, is generally a young man's game. Elderly people tend to be cautious, often indeed timid, and averse to physical danger. Violent crime is far less common among persons over 40, let alone over 60, than among younger persons.

*Id.* at 702. *See also United States v. Poke*, 793 F.3d 759, 760-61 (7th Cir. 2015) (noting drug dealing is a "young man's career, which a man would be unlikely to resume in his fifties, let alone his late sixties or early seventies"); *United States v. Wood*s, 808 F.3d 1177, 1179 (7th Cir. 2015)

("If a defendant convicted of dangerous criminal activity such as operating a drug stash house goes straight after being released from prison in middle age there is a fair likelihood that he will remain straight because the type of criminal activity that he had engaged in is a young man's game."). These concerns are relevant to any sentence that is imposed on Mr. Brown, as his age upon release will further diminish the risk of recidivism. *See United States v. Payton*, 754 F.3d 375, 379 (6th Cir. 2014) ("statistics suggest that past fifty years old there is a significantly lower rate of recidivism"). *See also United States v. Craig*, 703 F.3d 1001, 1004 (7th Cir. 2012) (questioning cost of imprisoning elderly and the likelihood of recidivism).

Lastly, a sentence that is closer to the ten-year mandatory minimum will also help ensure that Mr. Brown receives educational and vocational treatment. Such a sentence will afford ample time for Mr. Brown to engage in vocational and trade-related training in the BOP.[15] This training will help Mr. Brown secure gainful employment upon release, which he seeks to do without delay to support his children and relieve the burdens that his choices and his conduct have imposed on his family.

---

[15] In particular, Mr. Brown has identified the following programs in the BOP that he would like to pursue: the Life Connections Program; Federal Prison Industries; Apprenticeship Training; Vocational Training; and the Resolve Program.

IV.     **CONCLUSION**

For the foregoing reasons, counsel respectfully submits that a measured sentence that is substantially below the grossly bloated guideline range and much closer to the ten-year mandatory minimum, would be fair, just, and sufficient, but not greater than necessary.

Respectfully submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**

**DURKIN & ROBERTS**
209 S. LaSalle St., Suite 950
Chicago, IL 60604
(312) 913-9300
tdurkin@durkinroberts.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson Blvd., Suite 404
Chicago, IL 60404
(312) 909-0434
Email: jherman@joshhermanlaw.com